## AUSTIN *v.* AUGUSTA TERMINAL RAILWAY CO.

1. In that clause of the constitution providing that "Private property shall not be taken, or damaged, for public purposes, without just and adequate compensation being first paid" (Civil Code, § 5729), the word "damaged" is used in its usual sense as a law term, and does not change the substantive law of damages, or create a cause of action where none previously existed; nor does it abrogate the principle expressed in the phrase "damnum absque injuria;" but it does preserve all existing causes of action for damages to private property and prohibit exemptions of liability for such damages, even if occasioned by public uses.
2. The word "damaged" in this clause refers to "actionable wrongs," and does not require compensation for depreciation in the value of private property caused by the lawful operation of a public work owned by a corporation vested with the power of eminent domain, unless a private corporation or private individual would be liable for similar acts under like circumstances; nor is a quasi-public corporation liable where private property is depreciated in value as a result of the lawful use and enjoyment of the company's private property.
3. To "damage" property within the meaning of the constitution, there must be some physical interference with property or physical interference with a right or use appurtenant to property; and, therefore, a railway company is not liable to the owner of real property for diminution in the market value thereof, resulting from the making of noise, or from the sending forth of smoke and cinders, in the prosecution of the company's lawful business, which do not physically affect or injure the property itself but merely cause personal inconvenience or discomfort to the occupants of the same.

LUMPKIN, P. J., and LEWIS, J., dissenting. Though by the introduction into the constitution of this State of the words "or damaged," in the clause thereof quoted in the first of the preceding notes, nothing may have been made actionable which was not so at the common law, it does not follow that a railway company is not liable to an owner of land for causing a

diminution in the market value of the same by the making of deafening noises, or the sending forth of vast volumes of smoke and cinders, or by causing the walls of a building to vibrate and crack, notwithstanding these things may have been necessary to the legitimate prosecution of the company's lawful business. Such acts, if they have the effect indicated, are physical invasions of and interferences with the property rights of the owner of such land.

Argued February 7, — Reargued June 27, — Decided August 2, 1899.

Action for damages. Before Judge Eve. City court of Richmond county. August 31, 1898.

Mary Austin sued the railway company for depreciation in the market value of her residence by the construction and operation of its railroad and freight-yards. For a description of the relative situations of the premises, see the opinions following. She alleged that such depreciation had resulted by the company's occupancy of Bay street in Augusta, and of the lot adjoining in the rear of her residence lot, by taking from her one of the ways of ingress to and egress from her property; by throwing its roadbed across Cumming street, and introducing upon her premises river and surface-water from which it had hitherto been exempt; by subjecting her dwelling and outhouses by day and night to the danger of fire from passing and stationary engines; by encircling her dwelling with its tracks, and breaking the walls, weakening the joints, and defacing her property; by running engines and cars back and forth from Cumming to McCartan street, jarring the dwelling out of plumb; by throwing oily smoke and noise from the locomotives, begriming the furnishings of the dwelling and making conversation difficult; by opening her premises to tramps and vagrants and exposing the same to larcenies; and by forcing her to surrender the health and comfort of open windows in summer, to avoid smoke and cinders. She laid her damages at $3,000. For facts shown by the evidence see the opinions. Under the charge of the court the verdict was for the defendant, and the plaintiff excepted to the overruling of her motion for a new trial.

*Boykin Wright* and *F. W. Capers*, for plaintiff.
*Joseph R. Lamar*, for defendant.

SIMMONS, C. J. After this case had been regularly heard, it was ordered reargued on a question so framed as to embody the material points involved. An analysis of the evidence is, therefore, not necessary, further than to explain the situation of the property and the claim of the plaintiff. Bay street in the city of Augusta is laid along the southern bank of the Savannah river. Cumming and McCartan streets run south from it, at right angles. The railroad runs down Bay, past Cumming street; by a spur-track it crosses a lot, owned by the company, at the corner of Bay and McCartan streets, and thence runs across McCartan street into its freight-yard. Plaintiff's lot does not touch Bay or McCartan streets, but abuts on Cumming street, the Goodrich lot intervening between her premises and Bay street, along which the track is laid. Plaintiff's lot corners on land belonging to the company, upon which one track has already been laid, and the plats in evidence show that other tracks are to be laid thereon in the future. The lot with improvements cost $3,500, and was returned for taxes at $2,500, before and after the road was built. After the road was in operation, plaintiff demanded $5,000 as the price at which she would sell the property to the company. In spite of this demand and valuation the witnesses varied in their estimate of damages from 10 to 60 per cent. on the original cost; all of them stating that in their opinion the depreciation in value was caused mainly, if not exclusively, by the movement of cars in the freight-yard on the square across McCartan street, and distant some two hundred feet from plaintiff's lot. Petitioner also claims damages for laying the track and operating the cars in Bay street; but there was absolutely no evidence that she ever used Bay street, or that her means of ingress and egress had been interfered with in the slightest degree. Plaintiff's husband testified that he "noticed cracks, which he considered the result of vibrations," but this was the only allusion thereto, and no evidence was introduced as to the amount of damage occasioned by these cracks, or by any other one item of damage relied on by the plaintiff. Had she been entitled to recover for any specific act, it would have been impossible for the jury to have measured the amount or to have rendered a proper

verdict. All of the estimates were in a lump, besides being based principally on the result of operating the cars in the freight-yard. All immaterial matters being eliminated, claims not supported by the evidence being excluded, and the record showing that in the construction of the road no property of plaintiff was taken, nor were her premises damaged by reason of any means of access, right of way, or easement, remote or near at hand, being physically interfered with, invaded, or disturbed, the court finds that the record requires an answer to this question: "Is the railway company liable to the owner of real property for the diminution in the market value thereof resulting from the making of noise or from the sending forth of smoke and cinders in the prosecution of the company's lawful business, which do not physically affect or injure the property itself, but merely cause personal inconvenience or discomfort to the occupants of the same?" Plaintiff insists that as the market value of her lot has been diminished, in consequence of the operation of the railroad, she is entitled to recover therefor, by virtue of the provision in the constitution that "Private property shall not be taken, or damaged, for public purposes, without just and adequate compensation being first paid."

In a popular sense, the word "damage" does frequently mean depreciation in value, whether such depreciation is caused by a wrongful or a lawful act; but in statutes or other legal instruments giving compensation for "damages" the word always refers to some actionable wrong—some loss, injury, or harm which results from the unlawful act, omission, or negligence of another. In this sense, and as a well-defined law term, it was used in the constitution to give the owner of private property compensation for the actionable wrong whereby his property had been damnified, but it did not give him compensation for depreciation in value caused by any legal act; since in law such an act was innocent, and therefore harmless, or, if not actually harmless, "damnum absque injuria." There is nothing in the language of the constitution, or in the debates or in the proceedings of the convention, which shows any intent to enlarge its definition, or to make it mean more than it had always meant as a law term. Nor was this sentence framed with a

view of changing the substantive law of damages, or of making that actionable which before that time had been non-actionable. Rather, the purpose was, to make the law of damages uniform, so that a plaintiff could recover against a city or railroad under the same circumstances that would have authorized a recovery against those not armed and protected by the power of eminent domain. For example, if, prior to 1877, a manufacturing company had obstructed a street and thereby inflicted special damages, a property-owner so injured could recover; but if identically the same act had been done by a municipality under its charter, it would have been just as much " damage," though the property-owner could not recover, because the State's license to obstruct the street was authority for what had been done, a shield and protection, affording immunity from what would otherwise have been liability. In both instances it "damaged" the property, because, while it did not "take" the corpus of the estate, it yet physically interfered with an easement or right of way appurtenant to the lot; but in the one case he could recover, in the other he could not. The constitution intended to take away the city's exemption, and to leave it and the manufacturing company on an equal footing, ordaining that thereafter "damages" by whomsoever caused, and even if for public purposes, should be paid. But they must be "damages" in the sense in which that word is used and applied in courts. Thereafter, what is damage by one is damage by all; and likewise what is damnum absque injuria to one is so to all. If one landowner diminishes the market value of his neighbor's house by cutting off light and air therefrom, he is not required to make good the depreciation. He had a right to build the wall, and, legally speaking, he has not " damaged" his neighbor. So too, if a city should erect a public building, or a railroad put up a warehouse, and cut off the same easement of light and air, neither would they be liable; for they had the same right to build, and neither had they " damaged " the adjoining lot-owner.

The elaboration of this point is necessary, as the plaintiff insists that the use of the word "damaged" in the constitution gives her a new right, a cause of action where none would

otherwise have existed; and that wherever and whenever there is depreciation in value of real estate, as the result of constructing or operating works intended for public use, there is damage within the meaning of the constitution — citing cases from Nebraska, Texas, and Illinois, in support of her right to recover. The constitutions of those States may use the word "damage," or its equivalent, but the language thereof is not identical with ours. Then, too, the facts in those cases are somewhat different; but even if the reasoning and conclusions are conceded to be contrary to the views just expressed, it is an altogether sufficient answer to say that those cases are distinctly and avowedly opposed to the current of authorities, as found in the decisions of England, Massachusetts, New Jersey, Pennsylvania, West Virginia, Missouri, Minnesota, and Colorado, and to our own cases of *Peel* v. *Atlanta*, 85 *Ga.* 138, and *Sikes* v. *Albany*, 94 *Ga.* 30, each of which announces that the introduction of the word "damage" only makes the company liable to the same extent as an individual would have been at common law. We will consider these cases somewhat at length.

The Missouri constitution provides for payment where property is taken or damaged. Rude *v.* St. Louis, 98 Mo. (cited in the *Peel* case), holds that by the use of the word "damage" the constitutional convention expressed an "intention to require compensation in all cases where, but for some legislative enactment, an action would lie at common law." A New Jersey statute authorized the building of a bridge, upon payment of damages to such owners of bridges as might be *injured*. The court says: "These compensation clauses do not create any new right, their purpose being simply to preserve the common-law right of the person injured. If a railroad does an act injurious to another, which at common law would not be actionable, such person so injuriously affected can not claim redress by force of the clause under consideration." Columbia &c. Co. *v.* Geisse, 35 N. J. L. 558, following the English cases. In Jordan *v.* Benwood, 41 W. Va. 312, citing and following *Sikes* v. *Albany*, 94 *Ga.* 30, the court says: "The provision of the constitution, that private property shall not be taken or damaged for public use without just compensation, does not render

a city liable for damages from surface-water where a private individual would not be liable. . . It was not designed to put upon the State, or upon counties or municipalities—subordinate parts of the State government, a burden not resting on private corporations under the same circumstances." If, then, the constitution uses the word "damage" as a legal term, and as the equivalent of actionable wrong; if it does not repeal the principle expressed in the phrase damnum absque injuria; if it does not create a new cause of action, it remains to determine whether the plaintiff has been "damaged" within the legal meaning of that word.

According to the record, the defendant has not done any wrongful or unlawful act; it took no property; it invaded no right; it obstructed no way; it interfered with no easement or appurtenance, remote or close at hand. The diminution in value was caused by the lawful operation of defendant's cars on its own private property. A depreciation similar in kind, possibly equal in degree, might have been caused if police barracks or a jail had been erected in the near vicinity; and yet, according to the *Pause* case, this would have been damnum absque injuria. If a great manufacturing plant had been erected on the adjoining lot, the market value of plaintiff's house might have been greatly injured, no matter how silent the operations of the mill. Properly conducted, decently appointed, and orderly managed stores, shops, factories, and business houses, erected in close proximity to residential quarters, frequently cause great depreciation in values; in the popular sense they cause damage, but in such cases the annoyances, the inconveniences occasioning the loss in value, are not actionable, because they arise from lawful uses. The owners of these establishments are as much entitled to the use and enjoyment of their property as is the owner of the residence property reduced in value by their presence. The first occupier of land does not acquire the right to prevent his neighbor from erecting walls, digging excavations, erecting buildings, or engaging in manufacturing or mercantile business thereon, no matter how seriously such acts many depreciate the market price of adjoining property. If the acts complained of do not

amount to a nuisance, there is neither legal nor moral wrong done to the plaintiff. The framers of the constitution knew that railroads would *take* private property, would *damage* private property, and would *annoy* and *inconvenience* the holders of private property. For the first two of these consequences they provided a remedy; they could have done so as to the third. But they did not use the apt words to show that such was their intention. On the contrary, the guarantee of compensation was restricted to damages to property, not damages to person. They used a word which not only meant actionable wrong, but was identical with that already construed in Massachusetts, and was the equivalent of "injuriously affected," which at that time had been finally construed under the English condemnation acts to require a taking or a *physical* interference with the land, or some right appurtenant thereto, in order to entitle the plaintiff to recover. Inasmuch as no easement or other appurtenance belonging to the plaintiff was "physically interfered with," it is unnecessary to consider the cases which discuss the effect of that fact upon the right to recover. Under the old cases there had to be a *physical taking ;* under the present constitution there must be a *physical damage.* The property need not abut on the street, or be immediately contiguous to the railroad; it may be at a distance from the point where the injury is occasioned; but it must appear that plaintiff has some right, some user, some interest, which has been wholly or partially destroyed, before there can be a recovery, "There must be some direct physical disturbance of a right, either public or private, which plaintiff enjoys in connection with his property, and which gives to it an additional value, and by reason of such disturbance he has sustained a special damage." *Pause* v. *Atlanta,* 98 *Ga.* 98 – 100.

These conclusions are fully sustained by decisions in Iowa, under a statute requiring payment for "injury to property abutting on the street": Morgan *v.* DesMoines, 64 Iowa, 589; in Gilbert *v.* Greeley R. R., 13 Colo. 501, where the constitution required payment for damages; in Minnesota, in the Rochelle case construing the word "damages": 32 Minn. 201; in Massachusetts, where the statute required payment for "dam-

age": Old Colony R. R. *v.* Pressly, 103 Mass. 1; in New Jersey, where the statute required payment for "injury": Columbia etc. Co. *v.* Geisse, 35 N. J. Law, 558; in Missouri, where the constitution uses the word "damage": Rude *v.* St. Louis, 93 Mo. 408; in a number of most elaborately argued and carefully considered cases in England, where payment was required to be made for property "injuriously affected"; in Illinois, where the word "damage" is construed in the Rigney case; in the able opinion of the Supreme Court of Pennsylvania, in the Lippincott and Marchant cases, 119 Pa. St. 541, affirmed, 163 U. S. 380; and lastly, and, until reversed in the manner provided by law, conclusively for us, in the *Pause* case, 98 *Ga.* 100; *Campbell* v. *Metropolitan R. R.*, 82 *Ga.* 320; *Peel* v. *Atlanta*, 85 *Ga.* 138. "The damage must be to the land itself.
. . Any other construction would open the doors to claims of so wide and indefinite a character as could not have been in the contemplation of the legislature." Ricket's case, L. R., 2, E. & I. App. Cases, 198, cited in the *Peel* case. "The effect upon land of the annoyance or inconvenience arising from the frequent passing of the trains over a street by which it is approached affords no ground for damage. . . Such depreciation is not occasioned directly by any effect on the land of which the construction or the maintenance of the railroad is the cause. One belongs to that class of results which necessarily arise from the exercise of the franchise granted. The annoyances to the landowner are the same in kind as those suffered by the whole community, and the fact that land lying near the railroad is thereby rendered less desirable for the erection of dwellings, and of less market value in consequence, does not furnish an independent ground for the recovery of damages therefor." Pressly *v.* Old Colony R. R., 103 Mass. 6. "The injury must affect some right held with regard to the property. The injury must be to the land itself; and mere personal obstruction, or inconvenience, or damage to the trade, although of such a nature that it might have been the subject of an action, would not entitle the party injured to compensation. . . The injury must not be of a personal character, but must be to the land, considered independently of any par-

ticular trade. · There must be a physical interference as opposed to interference of a mental nature, or of an inferential kind. . . The word physical is here used to distinguish the case from that class of cases where the interference is not of a physical, but rather of a mental nature, or of an inferential kind." McCarthy *v.* Met. Works, L. R., 7 H. L. (Sc. & I. App.) 256. There is here a clear indication that the annoyances from smoke and noise are of a mental nature.

Whilst in Hammersmith *v.* Brand the plaintiff was denied damage for noise and vibration, occasioned, without negligence, by the passing of trains over the railway, for the construction of which no part of the land was taken; and while in Glasgow R. R. *v.* Hunter (L. R., 2 H. L.) compensation for noise and smoke was denied for the same reason, the result would have been different if there had been a physical interference or if the land or some right appurtenant had been invaded for railway purposes. Duke of Buccleuch *v.* Met. Works, L. R., 3 Ex. 306. And by the case of Ricket *v.* Met. R. Co., 2 H. L. 175, approved and followed in *Peel's* case, 85 *Ga.* 141, the rule was finally settled that the injury must affect some right held with regard to the property, and personal inconvenience was not a sufficient basis for compensation. And in the Rude case, supra, under the Missouri constitution, which uses the word "damage," it is said, "There must be some physical disturbance of a right, . . to entitle the property-holder to recover." The Georgia cases are in perfect harmony with these authorities, and distinctly rule the question involved in this case. In fact it would be necessary for this court to overrule the *Pause* and *Peel* cases in order to reach the conclusion that the plaintiff could recover. And it will be found that in every decision by this court, where a plaintiff was held entitled to recover for· damages occasioned by works for public use, there was always some physical interference with an easement, right of way, obstruction of the street near the premises, or some direct invasion of an appurtenance connected with the land. And in the many cases from other States, where the effect of smoke, noise, and cinders was considered, it will be found that the suit was by the owner of abutting property which had been

damaged by change of grade, obstruction in a street, an actual taking of a part of the land, or the maintenance of a nuisance. In *Bacon* v. *Walton*, 77 *Ga.* 339, a bill was filed to enjoin the erection of a jail on private property belonging to the county, for the reason that it would create a nuisance, produce irreparable injury, and damage private property without compensation. The court says: "This is not such a case as would be the change in the grade of a street and damage therefrom. The streets are under the government of the city, but all living upon them are interested in them for thoroughfares. The street is not the absolute property of a city, like the lot belonging to a county, on which a jail is erected, and the incidental damage done by its erection to the taste or sensibility of the residents around is too uncertain and remote to be considered damage in the sense of the constitution. It is in connection with *taking private property* that *damaging* it is used in the constitution." It is intimated in the Rigney case that under the old rule damages were limited to "taking" the corpus of property, while the use of the word "damage" enlarges the liability so as to allow damages for something besides a direct *physical injury to the corpus.* "But it is clear that it was not intended to reach every possible injury which is necessarily incident to the ownership of property in towns and cities, which directly impairs the value of private property, for which the law does not, and never has afforded any relief. . . Building of a jail, police station, will cause direct depreciation in the value, yet it is clearly a case of damnum absque injuria." Rigney *v.* Chicago, 102 Ill., followed in *Pause* case.

In the Elevated Railroad cases, damages from smoke and noise were allowed to abutting property owners. But the structures in the street physically invaded the owner's easement of light and air, as well as interfered with his means of access to his premises. But in no case has the owner of property on a cross street or a parallel street, no matter how close to the Elevated road, been held entitled to recover, so far as we have found. And yet it is almost certain, as a business proposition, that persons owning property abutting on cross streets have found their property depreciated in value as a result of the

construction and operation of the elevated roads. In our own case of *South Carolina R. R.* v. *Steiner,* 44 *Ga.* 546, the tracks were in the street immediately in front of the plaintiff's residence, physically invading his right of way, and thereby giving him a cause of action. When there has been this physical interference, there is a "damage" in connection with the "taking" of the private property consisting of an easement or right of way, and the plaintiff, being thus damaged, is allowed to show all of the elements of that damage. The effect of smoke and noise are considered, not as independent elements of damage, but as tending to prove the value of the property after the railroad has thus taken or damaged the property or some right appurtenant to the property. *Bacon* v. *Walton,* 77 *Ga.* 339; *Chapman* case, 88 *Ga.* 770. There must be damage coupled with a wrong, to give a cause of action. For a physical invasion or wrongful interference with property or its appurtenances, resulting in damage, the plaintiff may recover. Without some wrongful act on the part of the defendant she can not recover, even though there is deterioration in the value of her property. Considering the language of our constitution and our own decisions and this array of authorities, we can not follow the cases cited by the plaintiff, particularly as the case from Illinois seems to us in conflict with the Rigney case, which is generally approved by other courts, and by this court in the *Pause* case. The last of these cases decided by the Supreme Court of Illinois in 1896, Chicago v. Union Stock Yard & Transit Co., 7 Am. & Eng. R. R. Cases (N. S.), 499, held that the transportation of cattle through the streets created a serious public nuisance, for which reason the city had attempted to have the tracks removed. In denying the right of the city so to do, the court says: "It can not,. of course, be claimed that the city may compel the removal of all railroad-tracks from the public streets because those who live near the tracks are disturbed by those annoyances incident to the operation of all railroads. As was said in Chi. R. R. v. Joliet, 79 Ill. 25, and Ill. Cen. v. Graybill, 50 Ill. 244, 'such consequences of the construction and operation of railroads must be borne by all living near them, without complaint and without hope of redress, for they are inseparable from the purposes and objects of such structures.'"

Irrespective of all the authorities cited, there is a view of this question arising out of the very language of the constitution itself, which lends great weight to that construction which limits the damages recoverable to those arising from *taking* the land (*Bacon* v. *Walton,* 77 *Ga.* 339), or *physically* interfering with some right appurtenant thereto, excluding those which flow from the operation of the road. It is true that the requirement that damages shall be first paid was intended primarily for the benefit of the landowner. But the word is there not only for that purpose, but for all else it means when the sentence is read. And if, in requiring damages to be first paid, the constitution defines, as the damages to be paid, those which can be assessed and measured before the road is built, the conclusion is irresistible that the constitution guarantees payment of those direct, immediate injuries which certainly, directly, and inevitably flow from the construction of the railroad, highway, or other public works. If a street is laid out, no private property may be taken, and none may be damaged. Can it be that as travel increases, and with it the bustle and noise and dust arising from the use of the streets by drays and wagons, the municipality can be called on to compensate the property-holder who shows that, while he was not damaged by the construction of the street years before, the increased noise and dust have depreciated the market value of his residence? These annoyances flow from the operation of the street, and a city would be liable therefor, if under like circumstances a railroad is liable for the diminished value of near-by property, caused by the noise and smoke arising from the operation of the road. When no property is taken for laying out a street or building a railroad, it is not at all certain that the operation will cause depreciation, nor, if so, when and to what extent. That necessarily depends on the character of the vehicles used, as well as the extent of travel on the highway or the railway. Such depreciation may never come; it may come soon; it may be delayed for years; when it does come it may be more and it may be less. If plaintiff is entitled to compensation for the inconveniences and annoyances arising from smoke, then the amount of smoke is an important factor in the calculation.

But that depends not only on the amount of business and character of machinery, but on the quality of fuel used. Will it be hard coal, soft coal, or wood; or will these be varied from year to year; or will the company use animal power or electricity? The amount of noise will depend on the kind of engines and cars, and be largely influenced by the amount of business. And the amount of both noise and smoke reaching the plaintiff's premises will be lessened by the erection of buildings between it and the freight-yard, and increased if such structures should burn down. In the first place the market value may not be depreciated at all by these influences; and to attempt to say that it will be depreciated when the fact may turn out to the contrary, and then to say when and for how long the depreciation may exist, and next to determine how much these indefinite and fluctuating elements will affect the market price, is to "multiply uncertainty by uncertainty." And this view has been announced in the Marchant case, supra, where the court said: "The constitutional provision was only intended to apply to such injuries as are capable of being ascertained at the time the works are being constructed or enlarged, for the reason, among others, that it requires payment to be made therefor, or security to be given, in advance. This is only possible where the injury is the result of construction or enlargement. For how can injuries which flow only from the future operation of the road, and which may never happen, be ascertained in advance, and compensation made therefor?"

Our general condemnation law, as found in the Civil Code, also shows that the damages both direct and consequential, which are recoverable, are those arising from the construction of the works, from some visible and physical interference with a specific piece of property, or with some specific right or use connected therewith and capable of exact description. For the company is required to notify the owner what property or easement or franchise it proposes to take or damage. Civil Code, § 4658. The contention of the plaintiff would lead to the conclusion that every one within the circle affected by noise or smoke was entitled to notice, though it would be impossible to say how far that circle might extend before the road was

constructed, or how far it might be enlarged or diminished after the road was in operation; and that each member of the community could recover his share for this public annoyance, though the rule is that for public annoyances and inconveniences one property-holder has no cause of action. The property must be depreciated in value by being deprived of some right of user or enjoyment growing out of and appurtenant to his estate, as a direct consequence of the *construction* of the public improvement. *Pause* v. *Atlanta*, 98 *Ga.* 98–100. "It is in connection with *taking* private property that *damaging* it is used in the constitution." *Bacon* v. *Walton*, 77 *Ga.* 339.

We understand it to be conceded that, according to our own cases and the weight of authority, there must be some physical interference with property or with property rights, in order to recover. But it is claimed that noise and smoke amount to such physical invasion. If so, a recovery may be had for slight noises or for insignificant particles of smoke. True, the damages in such cases may be only one cent; but, inasmuch as no one has the right to physically invade the property of another, there can always be some recovery, no matter how insignificant or harmless the invasion may be. For a harmless but unlawful invasion in trespassing upon land by walking across a field a plaintiff could always recover at least nominal damages. It is an unlawful invasion; and if noise and smoke amount to a physical invasion, a plaintiff would have the same right to recover for the nominal damages occasioned thereby. Yet we apprehend that no one would claim there could be a recovery for such physical invasions by harmless noise and barely perceptible smoke; and for the reason that noise and smoke do not physically invade a right of property. If, then, the liability for damages caused by smoke and noise can not be based upon the theory of a physical invasion, it must be governed by the law of nuisance. And many and conclusive authorities may be cited to establish that a plaintiff can recover damages caused by noise and smoke sufficient in volume to amount to a nuisance; but noise and smoke per se give no cause of action. As noise and smoke affect the eye, ear, or the sense of smell, they would seem naturally to be in-

cluded among annoyances and inconveniences to person rather than injuries to property. 20 *Ga.* 358; 73 *Ga.* 366. They do not seem to be treated as technical trespasses against property. Wood on Nuisances, 107; 26 Am. & Eng. Enc. L. 570. If they be injuries to person, of course they are not included within the provision of the constitution as to the payment of damages to property. It is, however, unnecessary finally to determine here whether they are wrongs against person or property, or both; for in either case it must be admitted that smoke and noise give rise to no cause of action, unless they create a nuisance.

If, then, a recovery is dependent upon proof of the existence of noise and smoke sufficient to create a nuisance, the law applicable to nuisances must be enforced. While the State primarily owns the highway and can authorize the use thereof by railroads, and thereby legalize what would else be a nuisance in the streets, many courts have doubted whether any charter could legalize a nuisance which damages private property. 108 U. S. 332; 105 *Ga.* 45; 93 *Ga.* 561. And where a party is convicted of maintaining a nuisance, the judgment may direct its abatement: *Vason* v. *S. C. R. R.*, 42 *Ga.* 637; and the same may often be done in a suit for damages or proceedings for injunction: Wood's Nuisances, 876; *Macon* v. *Harris,* 75 *Ga.* 772 (11). In fact the law always contemplates that a nuisance is to be abated. The payment of damages is generally a mere solatium for past injuries, not an authority to continue the wrong; and often "persons who come to the nuisance" are entitled to damages and sometimes to an injunction: *Central R. R.* v. *English,* 73 *Ga.* 366; 16 Am. & Eng. Enc. L. 934. In many cases neither prescription nor the statute of limitations affords protection to the party maintaining the nuisance: *City of Augusta* v. *Lombard* 101 *Ga.* 727. We do not say that any one maintains these views; but if a railroad is a nuisance, we would be logically driven to apply to such cases the law of nuisance, and on the theory that nuisances can not be legalized the judgment would not only include payment for past damages but provide for an abatement. The courts would have to enforce the principle that for successive nuisances there can be

successive liabilities, and deny any defense based on prescription or the' statute of limitations. So that, where a road had been built since 1877, if a citizen should thereafter build within reach of the noise, smoke, and vibrations, and his house be thereby rendered less convenient—less valuable than it otherwise would have been, he could recover for such diminution in value. We must not lose sight of the fact that there is no hard and fast line separating lawful from unlawful occupations. Society adjusts itself to changed conditions, and so does the law. Cutting down timber was waste at common law; the conditions in this country were exactly reversed, and clearing up land in many instances was regarded as an improvement rather than waste. The easement to light and air was a valuable property right in England, but, without the aid of statute; and to meet a wise public policy, the doctrine of ancient lights has been practically abandoned in a country which was more interested in encouraging the building of new structures than in preserving the right of one owner to light and air coming across his neighbor's lot. There are thousands of factories, mills, furnaces, and other plants in this country, about which no complaint has ever been made in the courts, which would have been considered nuisances according to the old view of such structures. Yet around them, as around railroads, densely populated cities have grown, demonstrating that instead of being harmful and injurious nuisances, they are exactly the opposite. Yet if nuisances, persons who come thereto and build near by can have them abated, to the destruction of the community depending upon their existence for support. A rigid enforcement of rules and definitions announced in an age that knew nothing of locomotives and blast-furnaces would have stopped the wheels of commerce, put out the fires of furnaces, and silenced the rattle of manufactories. When, therefore, we see houses being built close to the line of railways, and the very building of these houses changing the farm into a village and the village into a city; when, as said by Judge McCay, 50 *Ga.* 462 (3), in a street-railroad nuisance case, "All experience shows that cities are every day more and more anxious for them;" when we see that people ride on railroads, sleep in their rapidly moving

cars, and voluntarily build and live, in city and country, near the line where cars move day and night, we are forced to hold that they are not nuisances, despite the frequent inconvenience and annoyance caused by their lawful operation.

This line of reasoning is fully borne out by case of *Ruff* v. *Phillips*, 50 *Ga.* 133, in which the court goes farther even than we might be personally willing to follow. A similar line of reasoning was adopted in an earlier case in this court, where, speaking on an application to enjoin the building of a steam planing-mill, Chief Justice Lumpkin said that it would not be a nuisance. "The only sense it will offend is that of hearing. And we know of no sound, however discordant, that may not, by habit, be converted into a lullaby, except the braying of an ass or the tongue of a scold. . . All persons purchase town lots in view of the possible purposes to which they may be appropriated. And if it be true that the risk from exposure will increase the insurance . . , it can not be denied that it will be more than counterbalanced by the enhanced value of property, produced by the prosperity of the city, occasioned by these establishments. It is suicidal to oppose them. There is too much that is fanciful and conjectural in the evils and dangers which are menaced. But be this as it may, as well attempt to stop up the mouth of Vesuvius as to arrest the application of steam to machinery at this day." *Mygatt* v. *Goetchins*, 20 *Ga.* 358. Other cases might be cited to the same effect, but none put the argument stronger than the trial judge in Bell *v.* O. & P. R. R., 25 Pa. St. 175. The affirmance was by a divided court, and it may not, therefore, be an authoritative decision, but the opinion can stand on the force and clearness of its reasoning. The application was to enjoin an unlawful invasion of plaintiff's right of commons, and to abate a public and private nuisance caused by the maintenance of freight-yards and the storage and moving of cars therein. "It does not appear that defendant creates any more noise or confusion than is usual or customary, or than is necessary and unavoidable in carrying on the business of their road. To deny them the use of their road would be, in effect, to exclude all railroads from our cities, . . to stop all machinery of every

description driven by steam, to stop all public markets which produce noise and disturb the citizens residing adjacent thereto, and restrain the use of coal because of the intolerable annoyance occasioned by its smoke. We live in an age and country of progress. New branches of business are constantly springing up on every hand. The unparalleled increase in agriculture, commerce, and manufactures demands increased facilities in travel and transportation. These and many other considerations require the modification of former rules, and judicious application of the expansive principles of the common law to the altered conditions of the country and the necessities of the public. The common law is said, and with great truth, to be the perfection of human reason. It is the embodied justice and wisdom of each successive age, moulded and formed into a system adapted to the habits and wants of the current times. These remarks are made for the purpose of showing that what would at one time have been held to be a nuisance might not, and probably would not, be so considered now. Private interests and comfort must often yield to public necessity or convenience. If the company had authority to make its road, they are entitled to the ordinary and necessary uses of their position, and would not be responsible for any unavoidable annoyances or disturbances such uses might cause."

While holding that a lawfully constructed and lawfully operated railroad is not a nuisance, we are very far from holding that it may not be so operated in streets or on its private property as to become a nuisance. Railroad companies may use defective engines which scatter unnecessary quantities of sparks, cinders, and smoke; at improper times and in an unnecessary manner they may sound their whistles and blow off steam; they may maintain cattle-yards in filthy conditions; they may maintain coal-chutes and roundhouses at improper places, and operate them so carelessly and noisily as to create a nuisance. But when they do so they will get no protection from their charter; for the legislature does not legalize nuisances, whether they are maintained by manufacturing companies, railroads, municipalities, or private individuals. It has been suggested that under our ruling in this case a railroad might so con-

duct its business as to render near-by property uninhabitable, drive the owner from his dwelling, and absolutely destroy its value. When such a case arises the owner would not be without redress; and that, too, whether the road had, in the first instance, condemned the land and paid damages or not. Payment of damages presupposes a subsequent lawful, usual and ordinary operation, not the creation of a nuisance. But the courts can certainly take judicial cognizance that the lawful operation of a railroad does not render property uninhabitable nor drive the owner from his premises. The unlawful use may do so, and for such unlawful use the law not only awards damages but it adjudges that the nuisance shall be abated; but it has no remedy for the diminution in value occasioned by the lawful use of adjacent property, whether that use is by a railroad or a factory, or the erection of some unsightly but lawful structure. *Central R. R.* v. *English*, 73 *Ga.* 366; *W. & A. R. R.* v. *Cox*, 93 *Ga.* 561; *Butler* v. *Thomasville*, 74 *Ga.* 570; *Ga. Chem. Works* v. *Colquitt*, 72 *Ga.* 172.

The marked difference between the lawful and unlawful use of railroad property, and the different consequences flowing therefrom, is discussed in Fifth Baptist Church *v.* B. & 'P. R. R., 108 U. S. 317, an instructive and weighty authority. There, the company's roundhouse was located close to the church building; in this roundhouse many engines were housed, cleaned, fired up, steam blown off—the act of blowing off steam frequently occupying from five to. fifteen minutes; hammering noises were made in the workshop, and other wrongs committed, including the building of sixteen smokestacks lower than the church windows and so placed that the smoke therefrom poured directly into the audience room. " The engine-house and repair shops as they were used by the railroad company were a nuisance in every sense of the term, and the liability of the company to respond for damages was not affected by its corporate character." The court thereupon laid down and applied the law of nuisance, wholly independent of the question of "taking or damaging property for public use." But it distinctly recognized that for the usual and necessary noises occasioned by the operation of the railroad as such, in the per-

formance of its public duty, a property-owner could not recover. Justice Field says: "Undoubtedly a railroad over the public highways, including the streets, may be authorized by Congress, and if, when used with reasonable care, it produces only that incidental inconvenience which unavoidably follows the additional occupation of the street by its cars, with the noises and disturbances necessarily attending their use, no one can claim that he is incommoded. Whatever consequential annoyance may necessarily follow from the running of cars on the road with reasonable care is damnum absque injuria. The private inconvenience in such case must be suffered for the public accommodation." If the company would not be liable for operating its cars in the usual and ordinary manner in the street, it surely would not be liable for the same sort of operation when it moved the cars out of the street upon its private property. This case seems to be directly in point and to sustain several of the propositions hereinbefore announced: that the consequential damages are damnum absque injuria; that one can not recover for noises necessarily attending the proper use of a railroad; that the private business of a railroad may be so conducted as to create a nuisance; and that when the nuisance exists the law of nuisance is to be applied, and not the law as to taking and damaging private property for public use. The company had no roundhouse, machine-shop, or structure at this point; these were the freight-yards immediately adjoining its depot where the public was served by it as a carrier. The evidence does not show any unlawful, improper, or unusual noise, smoke, or movement of cars. Therefore it could not have been a nuisance. In fact the petition does not allege that it was a nuisance.

But it is said that these views can only be correct as applied to chartered companies; that an unincorporated railroad is a nuisance per se, and the owner thereof liable for all damages which such nuisance occasions; and therefore the same liability attaches to a chartered railroad, inasmuch as the constitution preserves the common-law right of action and makes the company liable to the same extent and for the same acts as a private individual would be. And 1 Elliott on Railroads, § 1,

does, at first blush, seem to sustain the position; for it is there said that where a private person operates a railroad without legislative authority, "it will be at the risk of being held liable for maintaining a nuisance or for injuries caused by the operation of the road." 1 Wood, R. R. 2; 19 Am. & Eng. Enc. L. 923. Except Regina v. Train, a nisi prius case, to which we have had no access, we have examined all the other authorities cited, and find that they do not sustain the text. All of them refer to instances where railroads, without warrant of law, were laid on highways or alleys. Certainly an unauthorized use of the highways is a nuisance, whether it be by a private person or an incorporated railroad. "When a railroad authorized to be made at one place is made at another, it is a mere nuisance *on every highway* it touches in its illegal course." Com. v. Erie R. R., 27 Pa. St. 339. Not on the private property between the highways. See also *Kavanagh* v. *M. & G. R. R.,* 78 *Ga.* 271, 804; *City of Macon* v. *Harris,* 75 *Ga.* 771, 73 *Ga.* 428; *Savannah R. R.* v. *Woodruff,* 86 *Ga.* 98 (2). The excavation of the roadway, laying of cross-ties and rails, movement of cars, frightening of animals, and obstruction of the streets, besides the physical invasion of the property-holders' easements and the interference with their means of ingress and egress, create a nuisance which is wholly independent of the amount of noise and smoke. If the cars be run ever so noiselessly by steam, horse-power, cables, compressed air, or electricity, the result is the same. The gist of the nuisance is the obstruction of the highway. But the many cases which rule that an unauthorized and therefore unlawful use of the highway is a nuisance fall far short of ruling that a railroad on private property, and operated in the usual method, constitutes a nuisance per se, so as to entitle near-by property-owners to have the business abated, or recover damages, for the usual and necessary noises and inconveniences resulting from its operation. There are countless switches and private tracks on private property, running to and from factories, coal-mines, stone-quarries, mills, and warehouses, in daily use all over the country, and so far as we have found they are not treated as nuisances. Many miles of lumber roads in this State on private

property are operated by private owners, and they seem to be within the purview of the statute enacted for the protection of railroads. *Hodge* v. *State,* 82 *Ga.* 643. While this case does not call for a ruling as to the status of private roads, it is proper, in view of the argument, to consider whether they are nuisances per se.

It certainly is not unlawful for a private citizen to own and operate a railway on his own land. Pierce on Railroads, 2; 1 Rorer on R. R. 8. And we have found no case holding that a railroad on private property is a nuisance per se; on the contrary, a number of cases expressly hold that they are not nuisances per se. "Railroads in cities and towns can not with propriety be called nuisances. They are decided not to be such in numerous cases both by English and American courts." *Geiger* v. *Filor,* 8 Fla. 332, cited in 17 Am. & Eng. R. R. Cases, 186. To the same effect, Bell v. O. & P. R. R., 25 Pa. St. 161; Heitz v. L. I. R. R., 13 Barb. 646; Drake v. Hudson R. R., 7 Barb. 508, and other cases cited in 6 Rap. & Mack, R. R. Digest, 886 (2). Several Georgia cases afford some intimations to the same effect, though the exact question was not involved. *Atlanta R. R.* v. *Kimberly,* 87 *Ga.* 169; *Hanbury* v. *Woodward,* 98 *Ga.* 54; *E. T., V. & Ga. R. R.* v. *Boardman,* 96 *Ga.* 359; *Coast Line* v. *Cohen,* 50 *Ga.* 451. To which may be added the Marchant case, which in effect really decides the exact point, for the court there said: "This brings us to the question whether in case a natural person were the owner of this road, operating it in the manner the defendant company is doing, he would be responsible to the plaintiff in damages. We answer this question in the negative. He would not be responsible, for the reason that he would have a right to the reasonable use and enjoyment of his property; and if in such use, without negligence or malice, a loss unavoidably falls on his neighbor, he is not liable in damages therefor. . . If the construction contended for be correct, then we have a liability imposed upon corporations, in the operation of their works, which is not now, and never has been, imposed upon individuals. No principle of law is better settled than that a man has a right to the lawful use and enjoyment of his property, and that if in

the enjoyment of such right, without negligence or malice, an inconvenience or loss occurs to his neighbor, it is damnum absque injuria. This must be so, or every man would be at the mercy of his neighbor in the use and enjoyment of his own. The rightful use of one's own land may cause damage to another without any legal wrong. It is not contended that the injuries of which plaintiff complains are in any degree the result of the negligence or unskilled operation of defendant's road. On the contrary, the company has expended many dollars to enable it to convey its passengers and freight into the heart of the city. It might have hauled its enormous freights in carts or drays, and no one would have had a legal cause of complaint, although it is easy to see that the condition of the property-owners would have been far more intolerable than it is at present. If a natural person were the owner of this road, and were operating it in the manner the company is now doing, he would not be responsible, since he would have the right to the reasonable use and enjoyment of his property. The necessities of a railroad, the character of its business, compel it to seek the heart of a great city. This is as much for the convenience of the public as for its own use, because it is in the direct line of its duty, whether that duty be performed by a corporation or an individual. It is a part of the lawful use and enjoyment of property, and, when it is done without negligence, entails no legal liability therefor." Marchant case, 119 Pa. St. 541, affirmed, 153 U. S. 380.

Railroads not only seek centers of large cities for convenience of the public and their own profit, but they are left without option in the matter. Their route and the width of the right of way are fixed by charter, and depots and depot yards must necessarily be contiguous to the main line. So that it is impossible for the company to act on the suggestion made on the authority of Baptist Church *v.* B. & P. R. R., 108 U. S., where the court, after deciding that a roundhouse was a nuisance, said, "If the nuisance could not be abated, the plant must be located elsewhere." Changing the location of a roundhouse might be feasible, but changing the main line and adjuncts to the main line stand on a different footing. Location of the route by

charter also makes it impossible to sustain the position that "the wrongful act consists in the selection of the place where the plant is being operated." In itself it can not be wrong for the road to do that which it is required by law to do. Nor can it be, as suggested, that, because the train movement is greater in a freight-yard than along the main line, the company would be liable for decrease in value caused by constant movement of trains, and yet not liable for the diminution in value caused by the less frequent movement on the main line and in the country. The character and legal complexion of the company's act is not affected by the amount of business done by it. If the act complained of is unlawful, or a nuisance, it is liable. If the act is not a nuisance, and not unlawful, it is not liable unless there is some invasion of plaintiff's right.

We have thus, at considerable length, given the reasons for our decision; and, on account of the importance of the question, instead of giving mere citations, have departed from our usual rule and made frequent and lengthy quotations from the authorities. We can not do better than conclude with a final quotation from Carroll v. Wis. Cen. R. R., 41 N. W. Rep. 661, where, in speaking of railroads being a public necessity, the court says: "Operating them in the most skillful and careful manner causes to the public incidental inconveniences, such as noise, smoke, cinders, vibrations of the ground, inconvenience by interference with travel at crossings, and the like. One person may suffer more from these than another; for instance, one whose premises lie within one hundred feet of the railroad will feel the inconvenience in a greater degree than one whose premises are at a distance of one thousand feet, and one who has to pass many times over it suffers more than one who seldom has occasion to pass it. But the difference is only in degree, not in kind. Such inconveniences are common to the public at large. If each person has a right of action for such inconveniences, it would go far towards rendering the operation of railroads practically impossible."

While there are several grounds in the motion for new trial, the foregoing principles cover the controlling one in the case, and we deem it therefore unnecessary to discuss them. If we

are right in the opinion, it follows that the judgment refusing a new trial must be affirmed, although immaterial errors may have been committed during the trial.

*Judgment affirmed. The other Justices concurring, except Lumpkin, P. J., and Lewis, J.*

LUMPKIN, P. J.    After anxious and careful deliberation, Mr. Justice Lewis and myself were unable to concur in the judgment rendered by the court in this case. He has, in the opinion which follows, stated the reasons upon which our dissent is based.

LEWIS, J.    The right to exercise the power of eminent domain is inherent in sovereignty, and has been very properly defined to be "the right or power of a sovereign State to appropriate private property to particular uses for the purpose of promoting the general welfare." Lewis on Eminent Domain, §1. It embraces all cases where the property of a private individual is taken by authority of the State for the purpose of being devoted to some particular use, either by the State itself or by a corporation, public or private, or by a private citizen. It differs very materially from the exercise of the taxing power. Taxes are imposed upon some just basis of apportionment, and are exacted from individuals for their respective shares of contribution to a public burden. But when private property is taken for a public purpose by an exercise of the power of eminent domain, it is not appropriated as the owner's share of contribution to a public burden, but as so much over and above his share. To forcibly seize the property of an individual without compensation would be manifestly unjust and oppressive, and hence it is that all just governments make provision for compensation of the owner of private property that is taken for the benefit of the public. Corporations, as well as individuals, usually apply for this power of eminent domain for their profit. The State grants the power in consideration of the convenience and advantage to the public. It would indeed be a very unwise and unjust government that would compel an individual, without his consent, to surrender and sacrifice his property in order to promote either the interests of the

corporators of a public enterprise or the public at large. So keen has been the sense of wrong that would follow the exercise of such power conferred by a legislature, that it has been seriously questioned by some very able jurists whether such action on the part of a State legislature would be valid even in the absence of any constitutional limitation or restriction on the subject. But that is no longer a practical question in this country, for every State in the Union, except North Carolina, has in its constitution mandatory provisions requiring compensation to be paid to owners of private property which has been seized for public uses. The form of this limitation in nearly all the constitutions of the several States, is that private property shall not be "taken" for public use without just compensation. There has arisen considerable conflict of authority among the several courts of the different States as to the proper construction to be placed upon the word "taken," as used in these constitutional provisions, some of the authorities limiting the right of recovery to those whose property has been actually seized and appropriated, while others have given a more liberal construction to this word, and have applied it to cases where property has not been actually appropriated; but merely injured by an invasion of some property right of the owner, physically affecting the market value of the property. Viewed from the standpoint of simple justice, there is no reason why compensation should not be allowed in the one case just as much as in the other. The people of a few of the States, doubtless realizing, through their representatives in constitutional convention assembled, the great hardship which might arise by a strictly literal construction of the term "taken," have expressly extended the right to compensation to owners of private property which has been injuriously affected, by adding to their constitution a provision like that in the present constitution of Georgia, which declares that "Private property shall not be taken, or damaged, for public purposes, without just and adequate compensation being first paid."

The evident purpose of our fundamental law on this subject, as it now stands, is to compel those — whether corporations, companies or individuals — who exercise the high power of em-

inent domain for the purpose of carrying on a work or business claimed to be to the public advantage, to pay the entire cost of the enterprise, including the construction of the work and all damages naturally flowing from the operation of the business.   A part of the inevitable cost of putting on foot such an enterprise is the expense of compensating not only those whose property has been actually seized and appropriated, but also those whose property, though not so taken, has been injuriously affected and lessened in value.   The introduction into the later constitutions of several of the States of the words "or damaged," has given rise to further differences of judicial opinion, some courts contending that they relate only to such damages as would have been recoverable at common law in the event the wrongs complained of had been committed by an individual without statutory authority; and other courts holding that they refer to all damages causing a diminution in the value of property, whether such damages were recoverable at common law or not.   The majority of our brethren have, in the present case, adopted the first view, which seems to be supported by a great weight of authority.   We will not attempt to enter upon a discussion of the relative merits of these two conflicting views.   So far as a case like the present is concerned, we concede that the plaintiff must show that some property right of his has been injuriously affected by the wrongs complained of, before he is entitled to recover.   The word "property," however, should not be restricted in its meaning to such things merely as lands and tenements themselves, nor should a recovery by the persons aggrieved be limited to such physical injuries done them as are tangible and visible to an ordinary observer.   In the ordinary acceptation of the term "property," the common mind generally applies it only to such tangible, material things.   In legal contemplation, however, they may be regarded more the subject-matter of property than property itself.   To say the least of it, the law as jealously guards against unlawful interference with all easements and rights appurtenant to the ownership of lands as it does against an actual invasion of or trespass upon the lands themselves.   For instance, the owner of land is entitled to the water upon his place

in its natural state, and any pollution or contamination of the same by another, though brought about by acts done elsewhere than on the premises of the owner, will give a right of action for damages resulting from such wrongful act. Such owner has the same right to the pure atmosphere which envelops his premises, and any act done by another which impregnates it with foreign substances to such an extent as to render the occupation of the premises physically uncomfortable to a person of ordinary sensibilities will likewise give a right of action for the consequent injury to the value of the property. Where one occupies his premises as a home and habitation for himself and family, he is entitled to enjoy this occupancy with freedom from any unreasonable disturbance of the peace and quiet thereof. Indeed, there is no right of an individual more sacredly guarded by the common law than is this right of habitation. It is the ordinary, common use made of lands by the large mass of any civilized population. It is superior to any trade or business, or even a public enterprise that may be engaged in for the common welfare. Accordingly, where one is using his premises for the ordinary purposes of habitation or cultivation, he is entitled to the protection of the law in the quiet enjoyment of his property for such uses, and an action at common law will lie against his neighbor for the establishment in the vicinity of any business the operation of which will materially interfere with such enjoyment. In other words, where the interests of two property-owners conflict, the one who seeks to use his premises for an extraordinary purpose which operates to the prejudice of his neighbor will have to yield to the other, so long as the latter is merely asserting a right to the undisturbed enjoyment of his property for the ordinary purposes of life.

It is a great mistake, therefore, to suppose that one can do what he pleases with property he absolutely owns, and accordingly has a legal right to erect thereon any structure he sees fit for the purpose of carrying on a legitimate and useful trade or business. Every man holds his property subject to that universal rule: "*Sic utere tuo ut alienum non lædas.*" No one, for instance, has a right to erect upon his land a manufactur-

ing establishment the operation of which will necessarily produce such discomfort to the occupants of a home in the vicinity as to seriously impair the value of their habitation. This discomfort and interference with the natural and common-law rights of habitation may be brought about in a varied number of ways; but perhaps none are so common in the books as injuries produced by noise, smoke, cinders, and noxious gases or vapors caused by the operation of machinery. It is clearly the duty of the proprietors of such a business, in the selection of a site for the construction of their plant, to obtain a sufficient area of territory to guard against damages to owners of adjacent property. The lands in the immediate vicinity may even be vacant at the time of the construction of such works and the commencement of the operation of such business, yet the right nevertheless exists in the owners of adjacent lands to at any time use the same for the ordinary purposes of habitation or cultivation; and if subsequently they elect to do so, they have a right of action at common law against the proprietors of such enterprise. It makes no difference that the business conducted by them is perfectly legitimate in and of itself, or that it is carried on in a careful and diligent manner, with no more noise, smoke, etc., than is absolutely necessary for the proper conduct of the business. The wrongful act really consists in the selection of the *place* where the plant is being operated and its erection thereon. We gather from the headnotes and opinion filed by the majority of the court in the present case that it is conceded that the action brought by the plaintiff should be sustained if she has presented by the evidence introduced in her behalf such a case as would entitle her at common law to an action against a private individual who had, without statutory authority, done the acts complained of. If the construction and operation of the defendant's railroad would, at common law, have amounted to a nuisance resulting in special injury to her property, there can be no question that she would have a right, not only to institute proceedings to abate the nuisance, but also to recover damages for the injuries sustained. In considering the question as to whether the facts disclosed by this record give rise to a cause of action, it is, of

course, important to bear in mind the prominent features that were developed by the testimony introduced on the trial below. In the record appear, as a part of the evidence relied on by the plaintiff, plats or diagrams indicating the exact location of the plaintiff's premises with respect to the railroad-tracks and freight-yard of the defendant company in the immediate vicinity. While it may be true that the defendant's yard was two hundred feet from the plaintiff's residence, it appears from the plats and from the testimony that three of its tracks ran from its yard across an adjoining lot lying between Cumming and Bay streets, and that at one point these tracks came within forty feet of her premises. In switching cars and in the movement of trains, these tracks were in constant use, both by day and by night. It further appears that there were six or seven other tracks that entered the company's yard from an opposite direction.

The testimony introduced by the plaintiff showed that the noise caused by the movement of trains was almost unbearable to the occupants of her premises. So great was it that it sometimes stopped conversation. Furthermore, "the movement of the cars had a perceptible effect on the house." In this connection the plaintiff's husband testified: "We feel it like the effect of an earthquake. It makes the house oscillate. This occurs both day and night. I noticed cracks in the walls of my house, which I consider the result of this oscillation." This witness, in speaking of the switching, backwards and forwards, of cars on the tracks running past the plaintiff's residence, thus graphically described the situation: "That shifting is a kind of quadrille, forward and backward; a quadrille with freight-boxes. In shifting, these engines make it almost unbearable." Another witness testified: "The continual jarring and noise and smoke make it very disagreeable. . . I should think Mrs. Austin's property has been depreciated by the coming of the Augusta Railway Company in its neighborhood not less than fifty per cent. . . If there was no shifting yard there, and no pulling in and out of cars, and the train merely passed along Bay street, then I would not consider the damage so great. My evidence is largely influenced by the presence of these freight-

yards and passing in and out of shifting engines." There were a number of other witnesses introduced by the plaintiff, who testified that they were familiar with her premises and the location and operation of the defendant's railroad in the immediate vicinity. They variously estimated the depreciation in the market value of her property to be from thirty-five to sixty or seventy per cent. of its former value, and attributed this result to the operation of the defendant's railway. All of the witnesses offered in its behalf who testified on the subject admitted that the market value of the plaintiff's premises was injuriously affected by the construction and operation of its road in that vicinity, and estimated the damage thus occasioned to amount to at least ten per cent., some of these witnesses expressing the opinion that the diminution in market value of her property was as high as twenty-five per cent. It appears, then, that there was really no conflict in the evidence concerning the plaintiff's contention that her property was substantially damaged, not only as regards its value as a residence, but also as to its general market value, by the construction and operation of the defendant's road. The only difference among the witnesses was as to the extent of the injury and consequent loss sustained by her. It is also a fair, if not an unavoidable, inference from the testimony taken as a whole, that this effect upon the plaintiff's property was produced mainly by the repeated and continuous movement of cars back and forth in close proximity to her dwelling, causing such quantities of smoke, and such noise and vibration, as to create great physical discomfort to the occupants of the premises, and thus depreciate their market value for residence purposes, with no corresponding benefits to the owner arising from the location in the immediate vicinity of the defendant's railway. Indeed, there was no pretense on the part of the company that the plaintiff's premises had in this manner been in the least degree enhanced in value for other purposes, notwithstanding their utility for residence purposes had been impaired. It will, therefore, be readily perceived that this case is clearly distinguishable from that class of cases wherein the market value of property has not really been diminished by the building of a public improvement in the neighborhood, and

accordingly the owners thereof in reality suffer no substantial loss, and will not be heard to complain.

As a general proposition, it is of course true that the owner of property has a right to do with the same as he pleases, so long as he devotes it to a legitimate purpose; but the exercise of such right should always be understood as qualified by the proviso that he does nothing which injuriously interferes with the legal rights of others. For instance, the mere location of an unsightly structure on premises adjacent to the handsome residence of a neighbor may have the practical effect of diminishing the former value of such residence; but its owner would be without any legal redress, for the simple reason that no property right of his would thereby be interfered with. One's view might be seriously obstructed by the erection of a wall on a neighbor's lot, built in such a manner as to greatly detract from the appearance of the former's home and actually lessen its value as a residence, but manifestly no legal right of his would thus be invaded; and therefore it would be simply ridiculous to contend that he had any legal cause of complaint. To hold that he had a natural right to an unobstructed view over the lands of adjacent proprietors would place it in his power to decree desolation, so far as all improvements were concerned, in every direction from his residence, and as far-reaching as the natural landscape could enchant the human vision. On the other hand, as before seen, every one has a legal right to the reasonable enjoyment of his property whenever he desires to use or occupy the same for any ordinary purpose, and any act which seriously interferes with that enjoyment, to such an extent as to produce material physical discomfort and annoyance to the owner, and which would naturally produce this effect upon one of ordinary sensibilities, will give rise to an action under the well-defined rules of the common law. We use the words "one of ordinary sensibilities" advisedly; for it does not follow that, simply because a person of fanciful or fastidious taste might be annoyed and disturbed by ordinary noises and similar agencies produced on the premises of another, legal redress will be afforded as a matter of course. To illustrate, a resident of a large and populous

city is necessarily subjected to more discomforts from noise, smoke, and such things, than one who lives in a small town or village, or in the country; but this would be true merely because his neighbors were exercising their legal right to use their premises for strictly legitimate purposes, and his own were not sufficiently extensive to insure him that peace and quiet he might in a less populous locality enjoy. If, however, the owner of city property is subjected to any special annoyance and interference with the peaceful enjoyment of his premises, over and above what the public generally suffer, he is clearly entitled to invoke the protection of the courts. In a word, the question to be determined in any given case is: have the *property rights* of the individual seeking redress been unlawfully disregarded and invaded to his injury?

The case at bar is also to be distinguished from that class of cases wherein it appears that the damages complained of are of a public nature and no more affect the individual complaining than the public at large. Not unfrequently railroad companies are sued for causing an obstruction by their tracks of a public highway, and the courts, upon inquiring into the peculiar facts of a particular case, justly reach the conclusion that the wrong complained of has no more prejudicial effect upon the individual who makes complaint thereof than it has upon the traveling public generally, and, accordingly, the mere fact that he is the owner of realty at a greater or less distance from such obstruction, which does not interfere with the enjoyment of his property but merely annoys and interferes with him in his capacity of a citizen in the use of the street, will afford no reason for singling him out of the entire population as the proper party to enter complaint for a grievance common alike to all citizens who have occasion to use the highway. On the other hand, however, whenever it appears that an *easement* or *other right appurtenant to the ownership of realty* is interfered with by such an obstruction in a public street— as where, for instance, the natural ingress to and egress from one's premises have been seriously impaired, especial damage and injury does result to the owner of such property, and relief will be granted as matter of strict legal right. A distinction should likewise

be drawn between the present case and those in which it has been decided, in States where the organic law provides simply for compensation for property "taken," that redress can not be had for consequential damages thus arising to the owners of property which has not been actually appropriated to a public use. So far as we are aware, every court of the Union which has ever dealt with the provisions of a State constitution which, like ours, provided that private property should be neither taken nor *damaged* for the benefit of the public without just compensation to the owner, has unequivocally declared that the term "damaged" extends the right to compensation to the owners of all property injuriously affected, irrespective of the fact that it has not been actually appropriated; especially if the character of the injury be such as would give a right of action at common law. There is nothing in the record now before us that can authorize an inference that the damages complained of by Mrs. Austin are not special in their nature, or that they fall within the application of the doctrine of damnum absque injuria. A nuisance may be public and at the same time cause special injury to an individual or a number of individuals which is not shared in common with the general public, and in that event relief will be granted to any one or to all the persons thus peculiarly affected. Of course, it does not follow that merely because several persons are especially hurt the wrong-doer will be relieved from liability to any one of them. These principles are, so far as this court is concerned, effectually settled by the embodiment in our Civil Code of the rules of the common law bearing upon the subject. Section 3861 defines a nuisance to be "anything that worketh hurt, inconvenience, or damage to another;" and specifically declares that "the fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful, or such as would affect only one of fastidious taste, but it must be such as would affect an ordinary reasonable man." Section 3859 provides that if "a public nuisance causes special damage to an individual, in which the public do not participate, such special damage gives a right of action." On the subject of injuries to property, sec-

tion 3874 lays down the rule of the common law that: "The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a cause of action."

Now, in the light of the present record, how can it be seriously insisted that there was no testimony authorizing the conclusion that important property rights of the plaintiff were materially affected by the operation of the defendant's railway? Can it be urged that injuries of the nature she has sustained exist only in the imagination — that they are the result alone of a mere fanciful or fastidious taste — that a person of ordinary sensibilities would not be seriously incommoded or inconvenienced by the noise and jar of tremendous machinery, operating day and night in close proximity to his dwelling, causing it to oscillate and vibrate as though under the influence of an earthquake, until, as a result of this physical disturbance, great cracks appear in the walls of the building? It will be noted that the operation of the defendant's road in this particular vicinity was attended with unusual noise, smoke, cinders, etc. Immediately in the rear of plaintiff's residence, a freight-depot was erected, with divers tracks from different directions entering the company's freight-yard. Several of these tracks ran within forty feet of her house, and were in constant use, day and night, in switching cars, etc. It is quite manifest, therefore, that the noise and other disturbing agencies originated by the company in this particular locality were far greater than would ordinarily be occasioned by the usual running of trains between stations on its line of railway. In reason and justice, and in law, a railway company should be held to be under the imperative duty, when selecting a site for its freight-yards, repair-shops, etc., of paying due regard to the effect upon adjacent property. The idea is advanced in the able opinion filed in this case by the Chief Justice, that the business interests of railroads, as well as those of the public, require that they should seek the hearts of large and populous cities in the selection of sites for the location of their terminal facilities. The principal reason why a railway company seeks such a place for this purpose is on account of the profit which

will accrue to it; and though the general public may likewise
have an interest to be subserved in regard to this matter, we
are at a loss to perceive why the railway company should not
be required, as would an individual wishing to conduct a pri-
vate enterprise, to pay the legitimate cost of its *selection.* Rail-
way companies enjoy great privileges.    Were it not for the
fact that they operate under express legislative authority, the
business they conduct, tested by the rules of the common law,
would be by every enlightened court declared to be a nui-
sance, pure and simple, unless by grant or purchase they ac-
quired sufficient territory surrounding their works to insure
the owners of neighboring property against the evil effects at-
tending the operation of their lines of road.    When a railway
company is permitted to exercise the power of eminent domain,
it is not put to the enormous expense of buying such a vast
quantity of land as to enable it to confine all injurious agen-
cies generated by it within its own premises, but need actually
acquire title to only such lands as are necessary to a proper
operation of its road ; and as to adjacent property which may
be damaged, but for which the company has no particular use
and therefore does not care to purchase outright, it is permitted,
as against the owners thereof, to acquire the right to carry on
its chartered enterprise by merely compensating them for the
loss they sustain by reason of the depreciation in market value
of their property caused by the operation of a business which
our constitution plainly and unequivocally declares can not,
upon any other terms, be prosecuted at all, notwithstanding the
fact that public interests will thereby be greatly subserved.

It is not the policy of our fundamental law that the general
public should enjoy any advantage or benefit whatever at the
expense of a private citizen.    Indeed, the framers of our con-
stitution proclaimed that the people of Georgia were imbued
with a proper sense of independence and justice, and would not
demand at the hands of any individual who might elect to
make his abode among them the surrender of any property to
which he had just claim, without adequate compensation there-
for.    It therefore follows that however much the general pub-
lic may desire a given benefit which involves the expense of

paying such compensation, enjoyment thereof must be deferred until such time as our people find themselves financially able to make the purchase; and if a railway company undertakes, by the acceptance of charter privileges which the people have reserved to themselves, to supply them with a long-felt want, it can not, as the duly authorized representative of the State, assert any greater rights or immunities than it was within the power of its people to bestow, and accordingly is under the bounden duty of making full atonement to every private individual whose property is necessarily either actually appropriated or damaged in the successful prosecution of the enterprise. If the legitimate cost thereof is more than the company is able or willing to pay in consideration of the privileges conferred upon it as an inducement to serve the public, it can not, of course, carry into effect its good intentions of benefiting the people at large and, incidentally (?), making a profit to itself on the required outlay of capital which the investment involves. Were the enterprise projected wholly for the purpose of private gain to its promoters, it could not be lawfully conducted under ordinary conditions; for it would amount to neither more nor less than a common-law nuisance.     Only upon the idea that the material interests of the general public are advanced by the operations of public carriers, can the running of a railway through a populous locality be considered a legitimate and lawful business; and, in view of our constitutional provisions bearing upon this subject, we maintain that such a business loses the elements which would characterize it as a nuisance, if conducted without legislative sanction by an individual, only when its promoters comply fully with their constitutional obligation of making just and adequate compensation to every owner of neighboring property whose legal rights in the premises have been injuriously affected.     In a word, such an enterprise ceases to be a nuisance only from the moment its sting has been removed — when, after full atonement to every person who has suffered legal damages, its operation no longer interferes with the vested rights of others, and accordingly there is an absence of that inexcusable injury which characterizes the maintenance of what, in legal contemplation, constitutes a nuisance, either public or private.

The principles of the common law relating to nuisances resulting from unusual or excessive noises, smoke, cinders, or the impregnation of air with noxious vapors, are well established by judicial authority, both in England and in this country. It is a grave mistake to suppose that damages flowing from such causes are not recoverable unless they produce a visibly injurious effect upon the corpus of the property — a strictly physical injury thereto, tangible in its nature and readily apparent to the ordinary observer. The term "physical effect," used by a number of the authorities in this connection, is not intended to be restricted in its application and meaning solely to the visible signs made upon the subject-matter of the owner's property rights, but should be understood as covering every right appurtenant to the ownership of realty or personal effects, including the paramount right of uninterrupted and undisturbed enjoyment thereof. As a matter of course, one may be entirely deprived of this latter right, notwithstanding the tortious act by which this result is brought about leaves no visible traces of the injury inflicted, so far as the corpus of the property is concerned. That is to say, the term "physical" is used to distinguish the kind of injury meant from those which have purely a mental effect. In 1 Wood on Nuisances, § 3, the proposition is laid down, that "a use of premises that, by reason of its peculiar results, renders the enjoyment of life uncomfortable, is a nuisance, although it produces no visibly injurious effect upon property of any kind; such as noise so continuous and excessive as to produce serious annoyance, or vapors, or noxious smells that render the enjoyment of life uncomfortable." This able writer devotes an entire chapter of his work to the one subject of nuisances occasioned by smoke. See vol. 1, ch. 15. Another chapter is devoted to a discussion of nuisances produced by noise and vibration. Vol. 2, ch. 18. In section 495, the author says: "Every person has a right to have the air diffused over his premises in its natural state, free from all artificial impurities. Indeed, it may be said that no one has a right to interfere with the supply of pure air that flows over another's land, any more than he has to interfere with that neighbor's soil. The right is a natural one, and is just as

well recognized by the courts as the right to a natural flow of water. Therefore, every use of one's property that produces an unwarrantable impregnation of the atmosphere with foreign substances, to the detriment of another, is a nuisance, and actionable as such. This is true whether the injury arises from smoke, noxious vapors, noisome smells, or from loading the atmosphere [with] dust, chaff, or other foreign substances that would not exist there except for the act of the party through whose instrumentality it is communicated." In section 497, recognition is given to the right of a property-owner to recover damages, not only for injuries affecting the corpus of his estate, but also for such as impair its legitimate use and enjoyment; and the author asserts that: "If the injury complained of is to the enjoyment of property, it must be such as would render the occupancy of the premises physically uncomfortable to a person of ordinary sensibilities for any of the purposes to which the owner may choose to devote it. It matters not whether the enjoyment impaired is of a dwelling-house, a store, a shop, a studio; a church, a playground, or a garden or farm; it is enough if the result of the business or act complained of contaminates the atmosphere to such an extent as to impair the enjoyment of property for whatever purpose the owner may see fit to use it." In section 505 it is declared that "Smoke alone may constitute a nuisance;" and the author recognizes that it becomes a nuisance, not only when it produces a tangible injury to property itself, but when it sensibly interferes with the comfortable enjoyment of the same. "The rule is," he says, "that the comfortable enjoyment of the premises must be sensibly diminished, either by actual tangible injury to property itself, or by the promotion of such physical discomfort as detracts sensibly from the ordinary enjoyment of life." In vol. 2, § 611, of the same work, it is declared that "noise alone, unaccompanied with smoke, noxious vapors or noisome smells, may create a nuisance and be the subject of an action at law for damages." We further quote as follows from section 619: "A trade can not be carried on in a locality where, by reason of the noise incident to the business, it produces damage to others, and the diminution of the comfortable enjoyment of life or property is regarded as a sufficient damage to uphold an action."

The principles above announced are also supported by an almost unbroken line of judicial adjudications by the various courts of last resort in the United States. A leading case is that of Whitney *v.* Bartholomew, 21 Conn. 213, wherein it appeared that the blacksmith-shop and chimneys of a carriage-factory were placed near the dwelling-house of the plaintiff, and that cinders, ashes, and smoke issuing therefrom were thrown in large quantities upon his premises. The reviewing court held that while such a trade and occupation were unquestionably lawful and useful, and the building erected for the purpose of carrying on the same was not per se a nuisance, yet "if such building, though erected on the builder's own land and occupied in the usual manner, be in an *improper place*, where its use will probably result in an injury to another, this is, of itself, a *wrongful act* for which the wrong-doer is responsible to one essentially injured thereby." In delivering the opinion of the court in that case, Church, C. J., declared (page 218): "The first object of society and of the laws should be to protect life, health, and property, and the comfortable enjoyment of them; and whatever essentially, injuriously and unnecessarily affects these must be wrong. They are paramount to the mere convenience of pursuing a lawful calling in a particular place, and so the common law has considered it from the earliest times. . . The defendant assumes that, as he erected his shop and pursued his business on his own land, there could be no wrong on his part if the business was conducted with due care and caution. Herein, we think, is his mistake; and he will find no authority to sustain that position. He had a right to erect his shop on his own land; but he must so use it, even there, as not to injure his neighbor. Indeed, as we have said, the erection of a building on one's own land, with a purpose of its being so used that its use will probably result in an injury to others, is, of itself, a wrongful act. . . Blackstone says that even lawful trades, producing such results as the plaintiff complains of, should be carried on in remote places. 3 Bl. Com. 217." A similar ruling was announced in Duncan *v.* Hayes, 22 N. J. Eq. 25, wherein it was held that: "Filling the air around a dwelling-house with

dense smoke and soot or cinders, or with noxious or offensive vapors or odors, or with annoying noises, to such a degree as will render living in the house uncomfortable to persons of ordinary sensitiveness on those matters, is a nuisance and unlawful injury which will be restrained by injunction." In that case it was shown that the defendants had commenced the erection of a planing-mill and sawmill, to be driven by a steam engine fed with fuel of a character likely to produce soot and smoke in large quantities. The plant was located two hundred feet from the plaintiff's premises, whereon she was conducting a boarding-house; and the gravamen of her complaint was that the smoke from the fuel which the defendants intended to use in running their engine would "fill and surround her house and make it uncomfortable for her or her guests to live in, and that the sawing and planing-machines meant to be used [would] make an intolerable noise and render the house uncomfortable," so that it would "become an undesirable residence for boarders, and her business be greatly injured, if not wholly destroyed." Again, in Robb v. Carnegie, 145 Pa. St. 324, 14 Law. Rep. An. 329, the opinion delivered by Williams, J., discloses that the plaintiff brought his action to recover damages sustained by reason of the operation by the defendants, on their own land, of ovens used in the manufacture of coke, he alleging that the smoke and gas from these ovens passed over and across his farm, injuring his crops, diminishing the productiveness of the soil and the desirability of his house as a place of residence. In passing upon his right to a recovery, the Supreme Court of Pennsylvania, to which court the case was taken by appeal, held that one owning and operating ovens for manufacturing coke from coal obtained from strangers and not mined in the land on which the ovens stand, the natural effect of which is to substantially injure property in their vicinity, must pay to the owners of such property the damages sustained by them, although the ovens are located on his own land at a place so well adapted to the business that they would not be enjoined.

Another case directly in point is that of People v. Detroit White Lead Works, 82 Mich. 471. The defendants were en-

gaged in a manufacturing enterprise operated on their own lands. The owners of adjacent property, which was vacant when the plant was first put into operation, subsequently sought to use their premises for residence purposes. They made complaint that, in the prosecution of this industry, odors, smoke, and soot were produced of such a noxious character and extent as to materially affect the health of persons living in that neighborhood; and it was held by the court of last resort that "Where, after the establishment of a manufacturing business, the adjacent *vacant* land is utilized by the owners for *residence* purposes, to whom its continuance becomes a nuisance, the business must give way to the rights of the public, and those prosecuting it must devise some means to avoid the nuisance, or must remove or discontinue such business." In the opinion delivered by Grant, J., he said (page 478) that it was of no "consequence that the business is useful or necessary, or that it contributes to the wealth and prosperity of the community." In Wallace *v.* Auer, 10 Phila. 356, it appeared that the defendant conducted a workshop in which he carried on the business of a gold-beater and manufacturer of silver leaf. The effect of his operations was to seriously impair the comfortable enjoyment of adjacent premises owned by the plaintiff, rendering it difficult to hear conversation, and, by concussion, causing the house to be in a state of constant vibration. The following is a synopsis of the decision made in that case: "The business of a gold or silver beater, set up in a quiet dwelling neighborhood and by its noise and concussion unreasonably interfering with the quiet enjoyment, and perhaps safety, of neighboring property, is a nuisance which equity will restrain." If it were necessary, we could multiply the citation of authority in support of the principles above enunciated, but the foregoing will suffice to show the trend of judicial opinion in this country upon the subject. The decided weight of English authority is to the same effect. An instance in point is the decision pronounced in Heginbotham *v.* Steam Packet Co., 8 M., G. & S. 337, which was an action on the case brought by a hotel-keeper, who complained that the defendant maintained workshops, etc., near plaintiff's premises, and by the operation of the business con-

ducted therein made divers loud and unusual noises. As a re-
sult thereof, the plaintiff, his family and his guests, were greatly
disturbed and annoyed in the enjoyment of his premises. The
defendant pleaded to the action that it was a joint stock com-
pany, duly empowered under the law to carry on its business
by steamboats between England and France; that, for this
purpose, it was necessary to repair its steamboats at the particu-
lar place where its workshops were located, as the same could
be done there at less expense to the company; that its business
was conducted in a careful and lawful manner, and that the
noise produced was necessary and unavoidable. A verdict re-
turned in the plaintiff's favor was upheld by the court. Fol-
lowing is the entire opinion delivered by Maule, J., as to the
right of the plaintiff to recover in view of the plea relied on by
the defendant: "The plea was a plea in excuse, and not in de-
nial, — setting up a reason, and a bad one, for doing that which
was complained of in the declaration." In Cartwright *v.* Gray,
12 Grant's Ch. 399, the general rule was laid down that: "Every
one has a right to the air on his premises uncontaminated by
the occupants of other property, though those who live in a city
can not insist on the complete immunity from all interference
which they might have in the country. But the occupant of
city property can not justify throwing into the air in and around
his neighbor's house any impurity which there are known means
of guarding against." In this connection, see, also, Tipping *v.*
St. Helen's Smelting Co., 4 Best & Smith, 608. For other Eng-
lish cases having a direct bearing on the subject, see citations
of the same, and comments thereon, in 1 Wood on Nuisances,
§ 518 et seq. In section 517 the author deals with the case of
Hole *v.* Barlow, 4 C. B. 336, decided in 1858, wherein it was
held that the business objected to being a lawful and necessary
enterprise, and being carried on in a careful and in the usual
manner, and in a proper place, was not a nuisance. He calls
attention to the fact that this decision "made a wide departure
from the doctrine of previous cases decided in the courts of that
country," and adds: "But this attempt to overturn the entire
doctrine of the courts in restraint of noxious trades met with no
favor and was never recognized as an authority upon similar
questions by the able courts of England."

Following this comment the author cites a number of decisions rendered in that country, which clearly indicate that the common-law doctrine for which we are contending in the present case has been almost universally recognized and enforced by the English courts. In section 509 he specially refers to the case of Walter *v.* Selfe, 4 Eng. Law & Eq. 15, on the trial of which it was made to appear that the defendant had commenced the manufacture of brick upon premises adjoining those occupied by the plaintiff as a residence, and the smoke developed in the process of burning floated over the latter's premises and entered his dwelling, rendering its enjoyment physically uncomfortable. He contended that he had a right to an untainted and unpolluted stream of air from all directions over his premises, but this right was denied by the defendant. The court held, in effect, that inconvenience and discomfort caused the plaintiff by the impregnation of the atmosphere on his premises with smoke gave him a right of action against the defendant, and that the question as to whether such foreign substances in the atmosphere went to the extent of being noxious to human health, to animal health in any sense, or to vegetable life, was not an important one to be considered, as it was with a private, and not a public, nuisance that the defendant was charged. In the opinion filed in that case, Knight Bruce, the learned vice-chancellor, put the controlling question as follows: "Ought this inconvenience to be considered in fact as more than fanciful, or as one of mere delicacy and fastidiousness, as an inconvenience interfering with the ordinary comfort, *physically*, of human existence, not merely according to *elegant* or *dainty* modes and habits of living, but according to plain, sober, and simple notions among the English people?" This point was held to be against the defendant. Says Wood, in commenting upon this decision (pp. 703–704): "The doctrine of this case, in its fullest extent, has been adopted by the courts of this country and England, and the rule as to the degree of discomfort requisite to be produced from interferences with the atmosphere has been generally adopted as the true rule." It will be noted that the several adjudications hereinbefore referred to do not make one's right of action dependent upon the fact that the injury com-

plained of visibly affects the subject-matter of the property it-
self. To the casual observer no such injury need be apparent.
In accordance with this rule is the decision of this court in the
case of *Coker* v. *Birge*, 9 *Ga.* 425. There it appeared that the
defendant was about to erect a livery-stable, with a plank floor,
fronting on a public thoroughfare in a city, but entirely on his
own land, which was some sixty-five feet from a public hotel
owned and kept by the plaintiff. The latter claimed that the
carrying on of a livery business in the building erected for that
purpose "would cause irreparable injury to his property in said
hotel, and result in the loss of health and comfort to himself
and family, and in the loss of patronage to his hotel, in conse-
quence of the unhealthy effluvia that [would] arise from the
stable, the collection of swarms of flies, and the interminable
stamping of horses therein." It was held by a full bench "that
the erection of the stable at the place stated would operate as a
nuisance to the property of complainant, and that he was enti-
tled to an injunction to restrain its erection." In announcing
the decision of the court, Warner, J., quoted approvingly the
rule laid down by Blackstone, to the effect that if one does an
"act in itself lawful, which being done in that place necessarily
tends to the damage of another's property, it is a nuisance; for
it is incumbent on him to find some other place to do that act,
where it will be less offensive." The injury sought to be en-
joined in that case was not of a nature to visibly affect the house
or the premises of the plaintiff, but would have operated solely
upon the owner's right of undisturbed and peaceable enjoyment
thereof, together with his family and his guests. On the same
line was the decision rendered in *Athens Manufacturing Co.* v.
*Rucker*, 80 *Ga.* 291 (4), in which case this court laid down the
general rule, that "Whenever the right to enjoy one's property
to its fullest extent is invaded and injury arises therefrom, he
may recover any damages sustained by reason of such invasion,
nor is he bound to do anything to avoid the consequences
thereof."

We will now consider the question under discussion in the
light of the law relating to the exercise of the power of emi-
nent domain. In treating of this subject and in discussing

the liability of railroad companies for injuries to private property caused by smoke, noise, vibration, etc., it is stated in 10 Am. & Eng. Enc. L. (2d ed.) 1122, that "The courts are not agreed as to whether such injuries are to be considered a sufficient taking to require compensation. But no doubt the greater weight of authority favors the view that the owner of property thus injured may recover, if the property is rendered less desirable for the purposes for which it is used or to which it is adapted, excluding all such injuries as affect the owner in common with the people of the community." See, in note 2, a large number of authorities cited to support the text. In Lewis on Eminent Domain, § 234, the author, after a painstaking review of the decisions pro and con, announces his conclusion to be "that any interference with any *private right* appurtenant to property, such as the right of support, the right to pure air, etc., was a *taking* for which compensation must be made under our constitutions as they existed prior to 1870," the decision of many courts to the contrary notwithstanding. We certainly concur in the further opinion expressed by this eminent writer, that it is "clear that, where such interference is held not to be a taking, it must be held to be a *damage* or *injury*." Indeed, we have, during the course of our investigation, encountered in no text-book the suggestion that there is room for doubt or misgiving as to this particular point; much less have we been able to find any direct adjudication by any court to the effect that such damages are not recoverable under the provisions of a constitution declaring that just compensation must be made, not only for all private property actually taken, but likewise for all that is damaged, in the interest of the general public. In one of our early cases involving a construction of the term "taken," as used in our State constitution then of force (*South Carolina R. Co.* v. *Steiner*, 44 *Ga.* 546), it appeared that the City Council of Augusta conferred upon certain railway companies the right to operate a railway over and along one of the streets of that city, using steam or other power, and that the contract between the city and these companies whereby this privilege was granted was subsequently confirmed by an act of the legislature approved October 26, 1870. It was conceded, in that

case, that the fee to the soil in the street in question was in the State of Georgia, subject only to its use as a public highway by the people of the State. The railroads claimed the right to run their trains by steam power along this street, without responsibility for damages sustained by the owners of property fronting thereon, and the issue raised was whether or not such owners had a right of action growing out of the construction and operation of this railway and could recover damages caused by the noise, smoke, vibrations, etc., thereby occasioned. It was decided by a majority of the members of this court that, "While the use of a public street may be granted to railroads to lay bars of iron on to run over with trains, without endangering the street by obstructions or embankments, yet if the use of locomotives inflicts injury upon those who live on the street, by throwing smoke through the houses along the street, or by its weight shaking them or breaking the plastering or walls, etc., and by the noise and screeching of whistles and engines, the legislative right to run over the street does not make such acts harmless, and the injury inflicted upon the legal rights of the parties is not damnum absque injuria." It will be noted that this case was decided before the adoption of our present constitution of 1877, and at a time when the only constitutional provision of force looking to the compensation of owners of private property injuriously affected by the construction and maintenance of an enterprise conducted in furtherance of the public good related solely to the "taking" of such property for public uses. Nevertheless it was, in effect, held by a majority of the court that the injuries complained of amounted to a "taking" of property within the meaning of the organic law of this State as then expressed in its constitution. In the opinion delivered by Judge Warner, he says (page 561): "If the General Assembly, in the exercise of its right of eminent domain, should pass an act for the taking of private property for public use without providing any just compensation therefor, the act would be unconstitutional, in violation of the fundamental principles of the law as the same has existed from Magna Charta to the present time." Judge McCay, who declined to concur in the judgment rendered, based his dissent

wholly upon the proposition that there was no actual "taking" of private property for the public use, the property actually taken having always belonged to the public. While this case is not, strictly speaking, binding authority upon this court as at present constituted, the same not being a unanimous decision, yet its moral force and effect should not be overlooked. A careful reading of Judge McCay's dissenting opinion (pp. 562–3) will convincingly show, we think, that he fully recognized that the property rights of the owners of premises fronting on the street occupied by the railroad companies with their track had been seriously interfered with, and that they had accordingly suffered substantial damages; and this being so, doubtless he would have concurred in the judgment, had the constitution then of force specifically declared, as does our present constitution, that private property can neither be taken nor damaged for the public use, without just and adequate compensation being first paid.

The question now in hand was discussed at length by the Supreme Court of the United States in Baltimore & Potomac R. R. Co. v. Fifth Baptist Church, 108 U. S. 317. In that case it appeared that the railroad company had conferred upon it by an act of Congress authority to build its line into the city of Washington along a particular route selected for that purpose. The plaintiff made complaint that the company had erected an engine-house and machine-shop upon a parcel of land immediately adjoining a church edifice belonging to the plaintiff, and had since used them in such a way as to disturb, both on the Sabbath and on other days, the congregation assembled in the church, to interfere with religious services conducted therein, break up its Sunday-schools, and destroy the value of the building as a place of public worship. On the trial of the case it was shown that "these services were habitually interrupted and disturbed by the hammering noises made in the workshops of the company, the rumbling of its engines passing in and out of them, and the blowing off of steam; that these noises were at times so great as to prevent members of the congregation, sitting in parts of the church farthest from the shops, from hearing what was said; . . and that in the

summer time, when the windows of the church were opened for air, smoke, cinders, and dust were blown from the smoke-stacks through the windows of the church, settling upon the pews and furniture, soiling the clothes of the occupants, accompanied by an offensive odor, which greatly annoyed the congregation." An action was brought for the damages thus sustained, and a recovery had. In passing upon the merits of the plaintiff's complaint, it was held by the reviewing court that: "In an action at law damages may be recovered against a person who maintains a nuisance which renders the ordinary use and occupation of property physically uncomfortable to its owner; and if the cause of the annoyance and discomfort be continuous, equity will restrain it." It was further ruled that: "The measure of damages in an action at law against the maintenance of a nuisance affecting real estate is not simply the depreciation of the property. The jury are authorized also to take into consideration personal discomfort which may be caused by the nuisance," etc., "even if there be no arithmetical rule for the estimate." And it was still further distinctly ruled that "Legislative authorization exempts from liability to suits, civil or criminal, at the instance of the State, but it does not affect claims of private citizens for damages for special inconvenience and discomfort not experienced by the public at large." In the able opinion delivered by Mr. Justice Field, he said, in this connection (p. 331): "Whatever the extent of the authority conferred, it was accompanied with this implied qualification, that the works should not be so placed as by their use to unreasonably interfere with and disturb the peaceful and comfortable enjoyment of others in their property. Grants of privileges or powers to corporate bodies, like those in question, confer no license to use them in disregard of the private rights of others, and with immunity for their invasion. The great principle of the common law, which is equally the teaching of Christian morality, so to use one's property as not to injure others, forbids any other application or use of the rights and powers conferred." On page 334, speaking of the direct cause of the injury complained of in that case, he further says: "If, as asserted by the defendant, the noise, smoke,

and odors which are the cause of the discomfort and annoyance to the plaintiff, are no more than must necessarily arise from the nature of the business carried on with an engine-house and workshop as ordinarily constructed, then the engine-house and workshop should be so remodelled and changed in their structure as to prevent, if that be possible, the nuisance complained of; and if that be not possible, they should be removed to some other place where, by their use, the plaintiff would not be thus annoyed and disturbed in the enjoyment of its property." It is true, as stated by Chief Justice Simmons in the opinion filed by him in the case at bar, referring to the case just cited, that the right of action was based upon the maintenance of a nuisance by the railroad company; but he does not undertake to refer to any authority with a view to showing that the agencies put in operation by the defendant company in that case are not to be considered identical with those of which complaint is made in the present action.

Another case peculiarly in point upon its facts is that of First Baptist Church v. Schenectady & Troy R. R. Co., 5 Barb. 79. There, the church claimed damages resulting from noise and the jarring produced by steam-engines and cars which disturbed and molested its congregation and had the effect of diminishing the value of its house of worship. It was held in that case that it was enough to show that the plaintiff's property had been rendered less valuable for the purposes to which it was devoted, and it need not further appear that its value was likewise depreciated for other purposes. A ruling to the contrary was made in First Baptist Church v. Utica & Schenectady R. R. Co., 6 Barb. 313; but it is to be observed that while the decision in that case appears in a later report, it was really rendered at the May term, 1848, of the court, whereas the decision above cited from 5 Barb. was announced at the November term of that year, and overruled the decision reported in 6 Barb. In a more recent New York case, Drucke v. Manhattan Ry. Co., 106 N. Y. 157, 60 Am. Rep. 437, decided in 1887, Finch, J., in referring to the damages flowing from the construction and operation of the defendant company's elevated railway, said: "Smoke and gases, ashes and cinders, affect and impair the

46

easement of air.   The structure itself and the passage of cars lessen the easement of light.   The drippings of oil and water, and possibly the frequent columns, interfere with conveniences of access.   These are elements of damage even though the necessary concomitants of the construction and operation of the road, and not the product of negligence, for they abridge the landowner's easement, and to that extent, at least, are subjects for redress in an action for damages."   See, also, Story *v.* New York Elevated R. R. Co., 90 N. Y. 122, 43 Am. Rep. 146.

We will now direct attention to the precise questions passed upon and rulings announced in the cases cited and relied on by the Chief Justice, in the opinion prepared by him, as supporting the views entertained by a majority of the members of this court.   In Rochette *v.* Chicago &c. Ry. Co., 32 Minn. 201, it appeared that the defendant, in constructing its railroad, made an excavation extending across certain streets in the vicinity of the plaintiff's premises, thereby cutting off his most convenient and usual means of access to and from his place of business in the city.   It was simply held in that case that the injuries complained of were not special to the plaintiff, but the same in kind sustained by the general public in common with himself, and therefore the acts committed by the defendant, even if unlawful, would constitute a public nuisance merely, and not one entitling the plaintiff to maintain his action.   Furthermore, it was decided that the acts complained of did not constitute a "taking" of the plaintiff's property within the meaning of the constitution of Minnesota.   It is to be noted, in this connection, that the constitution of that State, in the clause thereof relating to an exercise of the power of eminent domain, merely provides that just compensation shall be made for property "taken," and does not, in addition, use the words "or damaged," or any other terms equivalent thereto.   What has just been said with reference to the case last cited also applies to the decision in Carroll *v.* Wisconsin Central R. R. Co., 40 Minn. 168, 41 N. W. Rep. 661, wherein a similar ruling was announced.

In Morgan *v.* Des Moines & St. Louis Ry. Co., 64 Iowa, 589, an action for damages was brought against the company, under

a statute of the State providing that municipal corporations should have power to authorize or forbid the location of railway-tracks along streets, but that no railway-track could thus be located and laid down "until after the injury to property abutting upon the street . . upon which such railway-track is proposed to be located and laid down has been ascertained and compensated in the manner provided for taking private property for works of internal improvement." A track was laid down which crossed another street on which the plaintiff was living; and the court simply held, in construing this statute, that the plaintiff had no cause of action, because his property did not abut upon the street along which the track was laid. As to the case of Columbia Delaware Bridge Co. v. Geisse, 35 N. J. L. 558, it appears from the report thereof that a statute of the State required the bridge company to pay damages occasioned to the owners of such ferries as might be injured by the erection of its bridge; and the court simply decided that the criterion of the right to recover was whether or not the acts causing the damage were such as, independently of the statutory powers of the company, would have been actionable at common law. The damages claimed in that case arose merely from loss of patronage, and it was accordingly very properly held that the owners of the ferry thus rendered less profitable had no common-law right to immunity from legitimate competition such as necessarily arose from the building of the company's toll-bridge. The report of the case of Pennsylvania R. R. Co. v. Lippincott, 116 Pa. St. 472, discloses that "a railroad company constructed a viaduct or elevated roadway upon property owned by it in fee, lying on one side of a street, and operated its steam railway thereon. From the noise, smoke, and dust caused by the engines and cars, the necessary consequence of the operation of the railroad, injuries resulted to the plaintiff's property on the opposite side of the street, no portion of which property was taken or used in the construction of said viaduct." And it was held that, "except on proof of negligence, the lawful use by a railroad company of a lawful erection entirely upon its own property is not the subject of damage," under the Pennsylvania constitution. On page 483, the provision of that consti-

tution under consideration was quoted as follows: "Municipal and other corporations and individuals, invested with the privilege of taking private property for public use, shall make just compensation for property taken, injured, or destroyed, in the construction or enlargement of their works, highways, or improvements." The difference between this provision and that contained in the constitution of this State is obvious. The former, in express terms, restricts compensation to cases where private property is taken, injured, or destroyed, in the *construction or enlargement* of works of a public character; and, therefore, it might with much force be contended that the framers of the Pennsylvania constitution did not contemplate that compensation should be paid to the owners of property in no way injuriously affected by the "construction or enlargement" of a public enterprise, although they might thereafter suffer consequential damages arising solely out of its operation in a legitimate and lawful manner.

This question was more particularly gone into in the subsequent case of Pennsylvania R. R. Co. *v.* Marchant, 119 Pa. St. 541, which is also especially relied on by the majority of our brethren. In construing the constitutional provision of that State above quoted, the court in that case held expressly that "The remedy provided by said constitutional provision, to secure just compensation by corporations for property 'injured or destroyed,' has relation to injuries which, though popularly termed consequential, are yet to be understood as confined to such injuries to one's property as are actual, positive and visible, the natural and necessary results of the original *construction or enlargement* of its works by a corporation, and of such certain character that compensation therefor may be ascertained at the time the works are being constructed or enlarged, and paid or secured, as provided in the constitution, in advance." Accordingly, a majority of the court announced their conclusion to be that the defendant company, which had not taken, injured, or destroyed any of the plaintiff's property during the course of the construction of its road, was not answerable in damages for any injuries incident and solely attributable to a subsequent *operation* of the road in a proper and lawful man-

ner and without any admixture of negligence whatever. It will be noted that Mr. Justice Sterrett declined to concur in the judgment rendered, and in his dissenting opinion (pp. 562 et seq.) enters into a very thorough and able argument in opposition to the views entertained by the majority. It is also proper to call attention to the fact that in the Lippincott case, supra, there was likewise a dissenting opinion filed by two Justices. The affirmance by the Supreme Court of the United States of the decision pronounced by the State court in the Marchant case adds no weight whatever to it as authority upon the questions therein dealt with. See that case reported in 153 U. S. 380. The Supreme Court merely undertook to pass upon the Federal questions raised, as to whether or not the plaintiff, under the decision made by the Pennsylvania court, had been denied the equal protection of the law. In the opinion delivered by Mr. Justice Shiras, he says explicitly (page 385): "We are not authorized to inquire into the grounds and reasons upon which the Supreme Court of Pennsylvania proceeded in its construction of the statutes and constitution of that State; and if this record presented no other question except errors alleged to have been committed by that court in its construction of its domestic laws, we should be obliged to hold, as has been often held in like cases, that we have no jurisdiction to review the judgment of the State court, and we should have to dismiss this writ of error for that reason."

The constitution of the State of Missouri, like the constitution of Georgia, employs the words "taken or damaged." The case of Rude v. City of St. Louis, 93 Mo. 408, is cited in the majority opinion filed in the present case to sustain the views therein advanced. It should be observed, however, that the Missouri court merely announced the well-established rule that "A property-owner, in order to recover damages for an obstruction to a highway, must show that the damages suffered are peculiar to him, being such as are different in kind, and not merely in degree, from those sustained by other members of the community." And, in applying this rule to the facts of that case, the court very properly held that the plaintiff, who alleged he had been damaged by an excavation in the street some five

hundred feet distant from his premises, so as to render the street impassable for teams, was not entitled to maintain an action. In the opinion filed in that case, the views expressed by the Supreme Court of Illinois in Rigney *v.* City of Chicago, 102 Ill. 80, seem to be endorsed by the members of the Missouri court, at least to the extent of recognizing the right of one to recover when there has been some direct physical disturbance of a right, either public or private, which the plaintiff enjoys in connection with his property and which gives to it an additional value, so that by reason of such disturbance he sustains peculiar damages not suffered by the general public. As the Rigney case is especially relied on as supporting the judgment rendered in the case at bar, it is pertinent to inquire what was really therein decided. We feel entirely confident that, instead of the decision being authority for the propositions for which it is cited by the Chief Justice, it can clearly be shown that the principles announced directly sustain the views set forth in this dissenting opinion. The constitution of Illinois, in so far as it provides that private property shall not be "taken or damaged" for public use, is identical with ours. That constitution went into effect in 1870, and was the first in the United States to extend the right to compensation by use of the words "or damaged." The action instituted by Rigney was one to recover damages against the city for constructing a viaduct or bridge over a public street not far from his residence, whereby he claimed his premises had been depreciated in value. On the trial of the case in the lower court there was a verdict and judgment in favor of the city, and the case was taken to the Supreme Court of Illinois for review. It reversed the judgment of the trial court, and held that damages were recoverable. It seems, from the facts reported, that the contention of the city was, that no property of the plaintiff had been actually taken or appropriated, and that the acts complained of, not physically affecting his property, gave him no right of action. The reviewing court, however, declined to restrict the meaning of the word "property," as used in the constitution, to such things as lands and tenements themselves, but construed it to mean "that dominion or indefinite right of user and disposi-

tion which one may lawfully exercise over particular things or objects. " It was further stated in this connection that, before the adoption of the constitution of 1870, it was a settled doctrine of the court that "any actual physical injury to private property, by reason of the erection, construction, or operation of a public improvement in or along a public street or highway, whereby the appropriate use or enjoyment of the property was materially interrupted, or its value substantially impaired, was regarded as a 'taking' of private property, within the meaning of the constitution, to the extent of the damages thereby sustained, and actions for such injuries were uniformly sustained. But the remedy was restricted to such cases of direct physical injury." In view of this fact, the court held expressly that, under the constitution of 1870, redress was afforded in cases not provided for by the constitution of force prior to that time, and that the additional protection thus secured to the owners of private property comprehended, "every case where there is a direct physical obstruction or injury to the right of user or enjoyment of private property, by which the owner sustains some special pecuniary damage in excess of that sustained by the public generally, which by the common law would, in the absence of any constitutional or statutory provision, give a right of action." Furthermore, the principle was clearly laid down by the court, that whenever there has been a physical disturbance of any legal right which one enjoys in connection with his property, whereby he sustains injury and damage, the fact that there was no direct, physical invasion of the premises themselves will not prevent a recovery. In the opinion prepared by Mr. Justice Mulkey (pp. 74 et seq.) he presents an able argument to the effect that, to restrict a recovery to direct, physical injuries to the property itself as distinguished from the owner's property rights therein, would be to make the words "or damaged," as used in the constitution of the State, entirely without meaning; for the right to recover damages for such injuries had existed under the previous constitution, which limited compensation to cases where private property was "taken" for public use. Attention was also called to the fact that while the term "property" was fre-

quently used to indicate the res or subject of the property, rather than the property itself, yet in its appropriate sense it included the right of user and enjoyment of anything which the law recognized as capable of becoming the subject-matter of ownership.

In Chicago *v.* Taylor, 125 U. S. 161, it was decided that under the provisions of the constitution of the State of Illinois, adopted in 1870, a recovery may be had in cases "where private property has sustained a substantial injury from the making and use of an improvement that is public in its character, whether the damage be direct, as when caused by trespass or physical invasion of the property, or consequential as in a diminution of its market value." That case came by writ of error from the circuit court of the United States for the northern district of Illinois. There was a verdict and judgment against the city, which was affirmed by the United States Supreme Court. The official report discloses that the court had under consideration the decision in Rigney's case, cited above. Other previous adjudications by the Illinois Supreme Court were reviewed, and express recognition was given to the new rule laid down in the Rigney case, that compensation must be made in all cases where there has been some physical disturbance of a right, public or private, which one enjoys in connection with his property, even though there has been no trespass upon or actual invasion of his premises. See page 168. It seems that counsel for the city in that case, in his argument before the reviewing court, dwelt somewhat at length upon the serious consequences which he predicted would result from enforcing the rule as laid down by the Supreme Court of Illinois. In reply to this argument, Mr. Justice Harlan, in the concluding sentence of his opinion, said: "We dismiss these several suggestions with the single observation that they can be addressed more properly to the people of the State in support of a proposition to change their constitution."

The identical question we are now considering was involved in the case of the Chicago &c. Ry. Co. *v.* Darke, 148 Ill. 226, 35 N. E. Rep. 750. That was a suit against a railway company to recover damages caused by the construction, maintenance,

and operation of its line of railway near the plaintiff's premises. The railroad was built on the opposite side of an adjoining avenue, and the complaint made was that in the operation of this road the company had thrown and deposited upon the plaintiff's premises dust, cinders, and smoke, etc., and that by reason of the running of trains her premises had been greatly shaken and disturbed. It was held that the owner of land in the vicinity of a railroad may recover for injury to his property caused by the noise and disturbance arising from the passage of trains. From the opinion filed by Bailey, J., in that case, it appears that error was assigned upon the refusal of the trial judge to charge the jury, as requested by the defendant, that there could be no recovery by the plaintiff for any damages caused by reason of the noise, confusion, or disturbance occasioned by the operation of the defendant's trains in its yards or upon its tracks. The Supreme Court ruled that this request was properly refused, saying: "The railway having been built and being operated by authority of law, its operation of course can not be held to be in law a nuisance; but, while that is so, it is difficult to see how the damages resulting to adjacent property from its operation are in any degree affected by that circumstance. If the noise, confusion, and disturbance caused by the defendant's engines and cars is such as would, in the absence of legislative authority, have constituted an actionable nuisance, the existence of such authority in no way relieves them of their damaging effect, so as to take away from property-owners their right to redress, or so as to convert what was before actionable into a case of damnum absque injuria." In reviewing the case of Railroad Co. v. Hall, 90 Ill. 42, Bailey, J., observed that an expression was used in the opinion filed therein to the effect that noise and confusion in the vicinity of the railroad could not be considered in the estimate of damages; but "on examining the report of the case, however, it will readily be seen that no such question was involved in the case, [as] no damages by reason of the noise and confusion caused by the operation of the railroad was claimed in the pleadings, nor, so far as appears, was any evidence on that subject offered, nor any claim made to damages

arising from that cause." Accordingly, he announced that the court adhered to its ruling in Railway Co. *v.* Nix, 137 Ill. 141, 27 N. E. Rep. 81, where it was held that when the noise made by passing trains has a tendency to render a farm less desirable as a place of residence, and therefore less valuable in the market, it was an element of damage which the jury might properly take into consideration. That an action for damages lies for injuries sustained by reason of smoke, cinders, and vibration occasioned by the running of trains on a railway, was also recognized by the Illinois Supreme Court in Chicago &c. Ry. Co. *v.* Loeb, 118 Ill. 203, 8 N. E. Rep. 460, and in Chicago &c. R. R. Co. *v.* McAuley, 121 Ill. 160, 11 N. E. Rep. 67.

In the constitution of the State of Nebraska is a provision like that contained in the constitutions of Illinois and of Georgia. The Supreme Court of Nebraska, in construing the words "or damaged," as used in the constitution of that State, held them to include all damages arising from an exercise of the right of eminent domain which caused a diminution in the value of private property. See City of Omaha *v.* Kramer, 25 Neb. 489, 41 N. W. Rep. 295; Railway Co. *v.* Hazels, 26 Neb. 364, 42 N. W. Rep. 93; Railroad Co. *v.* Janecek, 30 Neb. 276, 46 N. W. Rep. 478; and Jaynes *v.* Omaha St. Ry. Co., 53 Neb. 631, 74 N. W. Rep. 67, citing approvingly Gottschalk *v.* Railroad Co., 14 Neb. 550, which seems to be the parent case, wherein the court said (page 560), in speaking of the change wrought in the organic law of that State by the introduction into its new constitution of the additional words "or damaged": "The constitutional provision therefore is, that private property shall not be taken or injuriously affected without just compensation therefor. The evident object of the amendment was to afford relief in certain cases where, under our former constitution, none could be given. It was to grant relief in cases where there was no direct injury to the real estate itself, but some physical disturbance of a right which the owner possesses in connection with his estate, by reason of which he sustains special injury in respect to such property in excess of that sustained by the public at large. To this extent the property-owner is entitled to recover. It is not necessary, to entitle a

party to recover, that there should be a direct physical injury to his property, if he has sustained damages in respect to the property itself ,whereby its value has been permanently impaired and diminished. This is but justice. While public improvements are essential to progress and to the welfare of the race, yet as the public are to receive the benefits, whether by the opening of streets and public grounds or by the construction of railways, the party receiving the benefit should bear the burden. This should not be cast upon others."

The constitution of Kentucky also contains words equivalent in meaning to those employed in the constitution of this State. It provides for "compensation for property taken, injured, or destroyed." Ky. Stat. (1894) § 242. This identical question in reference to damages to property occasioned by discomfort of its occupants from smoke, noise, etc., of passing trains, was recently before the Court of Appeals in that State, when it was decided: "Damages may be recovered for injury to abutting property on account of annoyance and discomfort habitually suffered by the occupants from smoke, cinders, and unusual noise from trains passing over a railroad in the streets of a city." Louisville S. R. Co. v. Hooe, 47 S. W. Rep. 621, 622. In the same case it was decided that it was competent for the jury to consider whether the personal annoyance of the occupant would conduce to a diminution of the value of the property; and in the opinion by Burnam, J., it is stated: "If, as matter of fact, the occupants of this building habitually suffer annoyance and discomfort on account of the smoke, cinders, noise, etc., from passing trains, this fact tends to diminish the value of the property."

The constitution of Texas contains a similar provision by declaring: "No person's property shall be taken, damaged, or destroyed, or applied to public use, without adequate compensation." Rev. Stat. of Texas (1879), p. 2, § 17. In a recent decision by the Court of Appeals of that State, the same doctrine was announced with reference to a right of recovery against a railroad for such damages. In that case it was also ruled: "Where plaintiff was damaged by noise, dust, and smoke from a railway running along a public street, the fact that lot-owners

generally abutting on the same street suffered similar injury furnishes no reason why plaintiff may not recover." Texarkana & Ft. S. Ry. Co. *v.* Bulgier, 47 S. W. Rep.•1047.

We find nothing in any of the decisions of this court, which are relied on by counsel for the defendant in error and cited in the majority opinion delivered in this case, at all in conflict with our views of the law and a proper application thereof to the peculiar facts here presented.    The three cases mainly relied on are:    *Campbell* v. *Metropolitan St. R. R. Co.*, 82 *Ga.* 320; *Peel* v. *Atlanta*, 85 *Ga.* 138; and *Pause* v. *Atlanta*, 98 *Ga.* 92.    In the first case mentioned, it was held:    "Any evidence that will tend to show damage to the property would be admissible.    If noise, smoke, dust, cinders, or things of that sort, be shown to have damaged the property, they should be considered in arriving at the amount of the recovery, but if they amount merely to inconvenience or discomfort to its occupants, they are not an element of damage, and should not be so considered."    It will therefore be seen that the right to recover on account of noise, smoke, etc., whenever the effect of these agencies was to damage the property, is distinctly recognized in that case; and not a word is said in the opinion which can possibly warrant the assumption that the court intended to restrict the right of recovery to cases wherein it was shown that the premises of a private individual were physically invaded and a direct injury thereto committed, or that the term "property" was meant to include only the res or subject-matter of such person's property rights as owner.    In the *Peel* case, it appeared that the plaintiff brought suit against the city, alleging herself to be the owner of a lot of land, a portion of which she sold, and of which portion the city afterwards became the purchaser and opened a public street thereon adjoining the portion she retained, rendering it unsightly and depriving it of privacy, and that she had reason to fear assessments upon all three sides of her lot for street improvements, which fact reduced the value of her premises.    Accordingly this court held she had no right of action, as the city had committed no act interfering with any property right she could lawfully assert.    This case, therefore, has no application whatever to the facts presented by the

record now before us. In *Pause* v. *Atlanta*, it did not appear that there was any actual physical invasion of or interference with the premises themselves, which the plaintiff leased for the purpose of conducting a restaurant therein; yet this court nevertheless held that the plaintiff could maintain her action. Her complaint was, that she had suffered damages by reason of the obstruction by the city of a street running by the premises, which had the effect of impairing the use to which her apartments were devoted, in that, because of the inconvenience occasioned to her patrons, "her custom had fallen off to such an extent that the business could be carried on only at a loss." In other words, the injury complained of went solely to the peaceful enjoyment and user of the premises for the purposes she had rented them for, and had no injurious effect whatever upon the building itself or upon its market value. Upon the question of damages, it was, notwithstanding this fact, explicitly ruled that the plaintiff could recover for the loss sustained by reason of a diminution in the rental value of the leased premises; and while she could not likewise recover "the cost of fixtures or other improvements placed therein" with a view to conducting her business of restaurant-keeper, she was entitled to offer evidence to show "the increased value of the premises for rent in consequence of the putting in of such fixtures and improvements," which evidence should be by the jury "considered in computing the damages to the leasehold estate." Further comment upon that case would be superfluous.

We are further thoroughly satisfied that the requirement in our constitution to the effect that compensation shall be "first" paid, before private property is either taken or damaged for public use, lends no weight whatever to the position that the framers of our organic law deliberately intended, by making use of the word quoted, to exclude compensation for all damages which were the result of the operation, merely, of a railway. Indeed, we do not feel that we can, consistently with our duty to administer justice "agreeably to the laws and constitution of this State," arbitrarily add thereto the far-reaching proviso which any such construction of the clause under consideration imperatively necessitates. Obviously, the important

requirement that the owners of private property taken for the public use, "or damaged" thereby, should be "first" fully compensated, was intended for the benefit and protection of private individuals injuriously affected by an interference by the public with their vested legal rights incident to the ownership and unrestricted enjoyment of property of that character.    If not "first" paid, their right to demand compensation for injuries suffered might frequently prove an empty blessing; for what redress of a practical nature can one who has sustained such injuries possibly hope to have afforded him by the courts, in the event some wholly irresponsible corporation, or some totally insolvent aggregation of individuals, has ruthlessly invaded his property rights by virtue of legislative sanction?    Were it not for this wise provision in our constitution, even a court of equity might be powerless to protect him; for unless, as would be improbable, he was fully possessed of all the facts and was able to show beyond peradventure that he would suffer irreparable injury if the promoters of a wildcat and purely speculative enterprise, launched by them under the guise of a public benefit, were not enjoined, he could not avail himself of the remedy of injunction.    As our organic law now stands, he is at liberty to invoke this remedy the moment any corporation, however solvent and responsible it may be, undertakes, without payment of all damages in advance, to invade or interfere with his property rights; although, as a matter of course, he is not confined to this single remedy, and may, if he elects to venture the risk involved, wait until such time as these damages have actually accrued, and then institute suit to recover the same.    Furthermore, the construction given to our constitutional provision on the subject by the majority of the members of this court will inevitably operate to wholly cut off all right to compensation on the part of every property-holder whose premises are not actually appropriated, temporarily seized or invaded, during the course of the physical construction of a railway line or other public enterprise.    A moment's reflection will suffice to make apparent the fact that it is difficult, if not impossible, to conceive of a case where such a property-owner could logically claim to have suffered injury from the

mere *construction* of a public work, although the moment the same is, after final completion, put into *operation*, he may immediately begin to sustain injuries of the most aggravated character.    Our brethren nevertheless hold, in effect, that all damages arising solely from the operation of a railway are of such an uncertain character, and so difficult of reasonably exact computation in advance, that they can not be considered in any event recoverable, merely, forsooth, because of the requirement of our constitution that damages must, before the contemplated injury is inflicted, be "first" paid.

The somewhat ingenious, though unsound, argument presented by the Chief Justice in this connection may, however, be fully met by the observation that not only is it entirely practicable to measure in advance such consequential damages, but that, in every case where private property is either taken or damaged for the public welfare, all consequential damages thus arising must be so ascertained and first paid, is the positive mandate of our General Assembly.    See Acts of 1894, pp. 95 et seq.; Civil Code, §§ 4658, 4674, 4675, relating to the "condemnation of private property" under the power of eminent domain.    It may possibly be true that the owner of property adjacent to lands over which a railway is being constructed is frequently not in a position to know what effect the operation of the road, when completed, will have upon his premises.    This would result, however, really because, not being in the company's confidence, he would be uninformed as to the precise use, and the extent thereof, the company contemplated making of its works in the immediate vicinity. The company certainly would know how it wished and intended to use its own property in that neighborhood, and if it fairly and correctly communicated its information on the subject to a board of arbitrators who were familiar with the location, relatively to the company's works, of the premises of an adjacent landowner, we entertain no doubt that a just and sufficiently accurate award of damages would be possible, in the event the board came to the conclusion that the injuries which must inevitably ensue from the operation of the company's business overbalanced the benefits which the other party

would derive therefrom. The real danger to be anticipated would be, that the owner of adjacent premises would not be able to bring to the attention of the board all the elements of damage he would suffer, if the company did not in good faith acquaint him or it with all the details of its plans.    But certainly, if it is possible for a court of equity, upon an application by a property-owner to restrain the erection of a manufacturing enterprise in his neighborhood, to definitely ascertain what effect the contemplated project and its attending evils will have on adjacent property, if not enjoined, it is likewise within the range of possibility to ascertain in advance, with equal fairness and accuracy, what effect the same baleful agencies, if originated by a chartered railroad company, will have upon property so situated as to be inevitably more or less affected thereby.    No one has ever doubted the ability of a court of equity, upon such an investigation, to bring out the facts and from them arrive at a definite conclusion; and of course, if the evil effects which will be produced by noise, smoke, cinders, vibration, etc., be once accurately ascertained, the matter of compensation therefor can, agreeably to the law relating to the recovery of damages for such injuries, be as readily adjusted before as after their actual infliction. In this connection, the case of *Campbell* v. *Street R. R. Co.*, 82 *Ga.* 320, which has already been herein referred to, is quite pertinent. It was therein expressly ruled that: "Under the present constitution, whether the property is taken or not, if it is damaged by the construction or *operation* of improvements made for the use of the public, its owner can recover whatever damage it has actually sustained." And the present Chief Justice, then Mr. Justice Simmons, in delivering the opinion of the court, said (p. 325): "Under the new rule, whether the property is taken or not, if it has been damaged by reason of the construction or *operation* of any improvements made for the use of the public, the owner can recover whatever damage the property has actually sustained. So we think it does not matter whether the construction and operation of the street-railroad is a new use or burden on the street or not; if, by reason of such construction or operation, the private property of an individual is

damaged, he is entitled to recover therefor.'' As a number of the authorities above cited will show, it has been directly ruled, not only by several of the State courts but by the Supreme Court of the United States, that under constitutional provisions such as we have in Georgia, consequential damages arising from the operation of a railway are recoverable, independently of the question whether the mere construction of the road did or did not injuriously affect one complaining of the evil effects attending the prosecution of the business carried on by the company in a legitimate exercise of its franchises.

We can not agree with the majority of our brethren that in the operation of its road the defendant company in the present case committed no act of which the plaintiff could legally or justly complain. If, as was clearly shown by the testimony, that operation caused the damages complained of, the defendant has been guilty of a continuous trespass in thus producing damages without first making compensation therefor. That trespass consisted of an actual, physical invasion of the plaintiff's premises by using the same as an avenue of escape for noise, smoke, and vibrations which the company generated upon its own premises, but which were not confined thereon, and could not be, because of their limited extent. Even under the purely arbitrary rule adopted by the majority of the court, that it is incumbent upon a plaintiff to show that the injury complained of produced some visible, physical effect upon the property itself, we think, under the evidence submitted in this case, that Mrs. Austin was entitled to a recovery in some amount; for, among the obvious, tangible, and strictly physical effects shown by the testimony to have been caused by the operation of the company's road, was the cracking of the walls of the house; and furthermore, it was made to appear that her dwelling was otherwise physically disturbed, and in an almost constant state of oscillation, by the jarring produced by the defendant's engines and cars.

The argument advanced to the effect that if suits to recover merely consequential damages were tolerated by the courts, an immense amount of litigation would thereby be invited, and there would be endangered by speculative actions the prosper-

ity of numerous enterprises established for the public good, is not a matter for the judicial mind to consider. The same reasoning might apply with equal force to suits against corporations for personal injuries, the character of which is much more calculated to excite the sympathy of the average jury in favor of the complaining party. It is true that the owners of a business conducted under express legislative sanction for the public good should be fully protected in the enjoyment of all their legal rights; but this obligation is no more binding upon any branch of the State government than is the duty of also affording complete protection to the natural rights of the common masses of mankind, which are their unquestionable inheritance from the common law, and with which, as is shown by our constitution, they have never consented to part. Among these rights is that of habitation, ever regarded both by jurists and statesmen of all ages as of paramount importance. The right to the peaceable and comfortable enjoyment of home and farm immeasurably contributes to the peace and happiness of our people, and accordingly should be jealously guarded, not alone as a matter of simple justice, but as one of public policy. Regard for such right lies at the foundation of every just and good government. No other right of an Englishman has been more vigilantly upheld by the courts of Great Britain; and, doubtless, in this fact lies one of the most important secrets of her power, and the happiness, wealth, and prosperity of her people. It matters not how humble or dilapidated the home of a British subject may be; in the language of Lord Erskine, in one of his memorable speeches, "the King, with all his power, dare not, unbidden, cross the threshold of the ruined tenement."

The logical result of the conclusions reached by a majority of the court in the present case would necessarily lead to a denial of any relief to an owner of private property, even though he and his family might be actually driven from their home by noises so deafening, volumes of smoke and cinders so vast, and noxious and offensive gases and odors so baleful and injurious to the health, as to render the premises uninhabitable and absolutely worthless for any purpose. Unquestionably, as has been seen, the common law would have afforded relief against

any such wanton invasion of private rights; and we have no reason to believe that the framers of our present constitution even remotely contemplated that such rights should be ignored in any case where the power of eminent domain might be exercised, either by the State itself or by any corporation under legislative authority, in the taking or damaging of private property for the public welfare. If we are right in the view we confidently entertain as to this matter, it follows inevitably, as our brethren very frankly concede, that the judgment of the court below should be reversed.

# HEADNOTE CASES

### IN WHICH FULL OPINIONS WERE NOT FILED.

| 108 | 739 |
|-----|-----|
| 107 | 105 |
| d107 | 442 |

| 108 | 739 |
|-----|-----|
| 110 | 814 |

| 108 | 739 |
|-----|-----|
| f112 | 214 |
| f112 | 215 |